**CITY OF PLEASANT GROVE, Plaintiff,**

**v.**

**UNITED STATES of America,
Defendant.**

Civ. A. No. 80–2589.

United States District Court,
District of Columbia.

Aug. 3, 1983.

MacKinnon, Senior Circuit Judge, dissented and filed opinion.

Donald J. Cronin, Thomas G. Corcoran, Jr., Corcoran, Youngman & Rowe, Washington, D.C., Thomas N. Crawford, Jr., Cooper, Mitch & Crawford, Birmingham, Ala., for plaintiff.

Gerald W. Jones, Paul F. Hancock, Jeremy I. Schwartz, John K. Tanner, U.S. Dept. of Justice, Washington, D.C., for defendant.

## MEMORANDUM ORDER

Before MacKINNON, Senior Circuit Judge, and ROBINSON and GREENE, District Judges.

HAROLD H. GREENE, District Judge:

The City of Pleasant Grove, a residential community in Jefferson County, Alabama,

brought this action under Section 5 of the Voting Rights Act of 1965, 42 U.S.C. § 1973c, seeking a declaratory judgment that the annexation by the city of certain land [1] did not have "the purpose or effect of denying or abridging the right to vote on account of race or color." The Attorney General denied preclearance for the annexations because contiguous areas inhabited by blacks which had petitioned for annexation were not annexed by Pleasant Grove.

Presently before the Court is plaintiff's motion for summary judgment.[2] Plaintiff argues (1) that there is no evidence that the annexations were the product of a purpose to abridge the right of blacks to vote or had such an effect, and (2) that even if a purpose to discriminate could be established, it alone would not sustain the refusal of the Attorney General to clear the annexations.

## I

Pleasant Grove has a population of 7,086 people, all of them white.[3] Jefferson County as a whole has 671,197 residents, one-third of them black. Other municipalities in west central Jefferson County have substantial black populations,[4] and there are several unincorporated black communities directly to the south and southeast of Pleasant Grove. Pleasant Grove may thus accurately be described as an all-white enclave in an otherwise racially mixed area of Alabama.

The basic issue here is whether the Voting Rights Act forbids the annexation by Pleasant Grove of areas inhabited or likely to be hereafter inhabited by whites at a time when Pleasant Grove is refusing to annex contiguous areas which are inhabited by blacks. Resolution of this issue demands examination of two subsidiary questions— first, can an intent to discriminate be attributed to Pleasant Grove on the present record, and second, assuming that such an intent exists, is Pleasant Grove prohibited from proceeding with its annexations in the absence of any allegation by the government that the voting power of blacks will be impaired or diluted?

## II

The government's evidence, which, for purposes of the motions must be regarded as true,[5] shows an astounding pattern of racial exclusion and discrimination in all phases of Pleasant Grove life.

As early as in the 1940s, the Pleasant Grove city council acted to prevent the construction of a "colored housing project" within the city and directed the city attorney to draft a zoning ordinance designed to "restrict colored property." The city has thereafter consistently maintained a dual housing market through advertising and

---

1. The complaint initially sought relief only with respect to an area referred to herein as the Western Addition. On October 16, 1982, the Court ordered plaintiff to amend its complaint to include a second annexation, that involving the Glasgow Addition (see *City of Rome v. United States,* 472 F.Supp. 221, 247 (D.D.C. 1979)) and plaintiff has so amended. The Glasgow annexation was accomplished by a city ordinance on May 3, 1971; the Western Addition was annexed by a 1979 Act of the Alabama legislature.

2. Plaintiff has moved for summary judgment with respect to the Western Addition and for partial summary judgment with respect to the Glasgow Addition, requesting a finding that annexation of these territories did not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color. The government has not asked for judgment at this time, although its counsel stated at oral argument that it would be pre-

pared to stipulate that the affidavits and other exhibits filed by the two parties constitute the full trial record. Plaintiff has not taken a position on this suggestion.

3. Thirty-two of the inhabitants are black, but they all live in a nursing home; they do not vote; and their residence in the city was apparently unknown even to the city officials at the time of the latest annexation. Because of the peculiar status of these 32 blacks, both parties have treated the City of Pleasant Grove as being all-white, and so will the Court.

4. Birmingham's population is over 55 percent black, Bessemer 51 percent, Hueytown 9.6 percent, and Fairfield 52 percent black.

5. The government has submitted affidavits, excerpts from depositions, answers to interrogatories, and the like, to attest to all the facts alleged in its briefs.

marketing directed exclusively to white buyers. In 1978, the city council adopted an exclusionary zoning ordinance which was found by a federal court to have a racially restrictive effect.[6]

Pleasant Grove's annexation policy followed a similar pattern. For example, the city refused to annex the site on which the "black" Woodard School was located in an attempt to avoid school desegregation orders issued by a federal court. See p. 1457 *infra*. However, shortly after that refusal, the city annexed the Glasgow Addition which is located several miles outside the city limits past a black neighborhood which was not annexed. The city also declined at various times to annex two parcels of land[7] because of their location adjacent to black areas and the possibility that these areas might, in turn, press for annexation. In 1979, Pleasant Grove began its effort to annex the Western Addition which, together with the Glasgow Addition, is now directly before the Court in this action.[8] While the Western Addition annexation was taking its course, two black areas (Pleasant Grove Highlands and the Dolomite area) petitioned for annexation. Both were rejected.[9]

Pleasant Grove's discriminatory policies have not been confined to housing, annexations, and zoning.[10]

Prior to 1969, Pleasant Grove maintained a rigidly segregated school system: black children living in close proximity to Pleasant Grove were bused elsewhere. When a federal court mandated an end to this system on August 4, 1969,[11] the city council voted to secede from the county school system on the very evening of the day the court order was issued.[12] Moreover, although the County is one-third black, Pleasant Grove itself has never had a black employee.[13]

From all of these facts, a court could appropriately draw the inference that the City of Pleasant Grove had and has the purpose to discriminate against blacks with respect to voting as with respect to other subjects. To be sure, the incidents of discrimination do not directly involve voting,

---

**6.** *Wheeler v. City of Pleasant Grove,* C.A. No. 78–G–1150–S (N.D.Ala.1979).

**7.** Known as the Kohler and the Westminster areas.

**8.** While the Western Addition is undeveloped, its location and the city's plans indicate that it is likely to be developed for use by white persons only.

**9.** There is a dispute between the parties as to the relative economic benefits and detriments to Pleasant Grove as between the white areas and the black areas. These disputes cannot be resolved on a motion for summary judgment. Suffice it to say that, on the record as it presently stands, there are at a minimum genuine issues of material fact on these matters. The burden of proof is, of course, on Pleasant Grove. *South Carolina v. Katzenbach,* 383 U.S. 301, 335, 86 S.Ct. 803, 822, 15 L.Ed.2d 769 (1966); *Georgia v. United States,* 411 U.S. 526, 538, 93 S.Ct. 1702, 1709, 36 L.Ed.2d 472 (1973).

**10.** Evidence of discrimination with respect to matters other than annexation or voting is relevant on the issue of purpose in Voting Rights Act cases. *Rogers v. Lodge,* —— U.S. ——, ——, ——, 102 S.Ct. 3272, 3278, 3280, 73 L.Ed. 1012, 1021, 1023 (1982); *Busbee v. Smith,* 549

F.Supp. 494, 516–17 (D.D.C.1982) (three-judge court).

**11.** *Stout v. Jefferson County Board of Education,* C.A. No. 65–396 (N.D.Ala.1969).

**12.** In subsequent litigation, the Court of Appeals for the Fifth Circuit held that the Pleasant Grove school system was not to be recognized if it has the effect of thwarting the implementation of a unitary school system. *Stout v. Jefferson County Board of Education,* 448 F.2d 403 (5th Cir.1971). When, on remand, the District Court required Pleasant Grove to provide transportation to the black children assigned to its schools, the mayor announced, with the approval of the city council, that Pleasant Grove would not do so. Ultimately, the court abolished the Pleasant Grove school system and transferred control of the schools back to Jefferson County. *Stout v. Jefferson County Board of Education,* 466 F.2d 1213 (5th Cir. 1972), *cert. denied,* 411 U.S. 930, 93 S.Ct. 1891, 36 L.Ed.2d 389 (1973).

**13.** It may also be noted that the city council has authorized the formation of a chapter of the White Citizens Council; thanked Governor George Wallace for his fight against integration; and condemned the Birmingham Bar Association for its expression of moral support to District Judge Pointer for his efforts in *Stout.*

nor could they, since there were and are no blacks eligible to vote in Pleasant Grove: all blacks have simply been kept out. Nevertheless, as the Supreme Court has said, the "historical background of [a] decision is one evidentiary source, particularly if it reveals a series of official actions taken for invidious purposes." *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 267, 97 S.Ct. 555, 564, 50 L.Ed.2d 450 (1977). For that reason, proof of discrimination in a variety of fields may be used as proof in an action charging discrimination in voting. *See note 10 supra.*

The present record, if unrebutted, would warrant a finding that the City of Pleasant Grove had the purpose, in its annexation decisions, of "denying or abridging the right to vote on account of race...." 42 U.S.C. § 1973c. The next question to be determined is whether such a finding would entitle the United States to judgment in its favor after a trial and, thus, would defeat plaintiff's motions for summary judgment.

### III

Pleasant Grove contends most vigorously that, especially in an annexation case, proof of a discriminatory purpose is insufficient; that there must be proof of a discriminatory effect. It further reasons that, since there are no black voters (or persons even arguably eligible to vote) in the city, there could be no proof of a discriminatory effect, and the government's claims must therefore be rejected.

The basis for these arguments is as follows. While according to *City of Richmond v. United States,* 422 U.S. 358, 95 S.Ct. 2296, 45 L.Ed.2d 245 (1975), annexation constitutes a change in a voting practice or procedure, under that decision an annexation violates the Voting Rights Act if it reduces the proportion of voters of a particular race in the affected locality (or if the minority race has been denied the opportunity to obtain representation reasonably equivalent to its political strength in the enlarged community). It follows, according to plaintiff, that

since there are no blacks eligible to vote in Pleasant Grove, the government cannot meet the *City of Richmond* standard. This conclusion is said to be buttressed by *Beer v. United States,* 425 U.S. 130, 96 S.Ct. 1357, 47 L.Ed.2d 629 (1976) which held that the Voting Rights Act does not require preclearance for a *failure* to change a voting practice or procedure (as distinguished from an *active alteration* of such a practice or procedure). Again, since, with regard to the black areas at issue here, Pleasant Grove has simply failed to annex them, the *Beer* decision, so the reasoning goes, constitutes a complete defense.

This argument is not persuasive. The *City of Richmond* case and other, similar annexation decisions discuss the applicable standard in terms of the effect of the annexation on black voters in the annexing community because in those cases there happened to be black voters in that community and hence the annexations did have the effect of reducing their voting power. These cases do not discuss, and hence they do not reject, the application of a purpose test, particularly not in the context of an annexation where, as here, there are no black voters in the annexing municipality.

However, a number of recent decisions make it clear that a discriminatory effect (on blacks already living in a community) is not the only yardstick by which discrimination in violation of the Voting Rights Act may be measured, and that annexation decisions made with a discriminatory purpose—regardless of effect—also constitute violations of the Fifteenth Amendment and the Voting Rights Act.

In *City of Port Arthur, Texas v. United States,* —— U.S. ——, 103 S.Ct. 530, 535, 74 L.Ed.2d 334 (1982), the Court held that

> ... even if [a particular] electoral scheme might otherwise be said to reflect the political strength of the minority community, the plan would nevertheless be invalid *if adopted for racially-discriminatory purposes...* (emphasis added).[14]

The recent case of *Lockhart v. United States,* —— U.S. ——, 103 S.Ct. 998, 74

---

**14.** The dissent charges us with misstating the Supreme Court's ruling in that case by failing     to quote an entire paragraph from the opinion.

L.Ed.2d 863, further supports this conclusion. The Court there referred with approval to the district court's recognition "that the City must prove both the absence of discriminatory effect and discriminatory purpose ...," *id.* 103 S.Ct. at 1001, and that "[i]n view of its decision on discriminatory effect, it was unnecessary for the District Court to reach the issue of discriminatory purpose." [15] *Id.* 103 S.Ct. at n. 4.

Indeed, the Supreme Court has described as discriminatory the very fact situation presented by this case. In *Perkins v. Matthews,* 400 U.S. 379, 388, 91 S.Ct. 431, 437, 27 L.Ed.2d 476 (1971), the Court said,

Clearly, revision of boundary lines has an effect on voting in two ways: (1) *by including certain voters within the city and leaving others outside, it determines who may vote in the municipal election and who may not;* (2) it dilutes the weight of the votes of the voters to whom the franchise was limited before the annexation.... (emphasis added).

The second category mentioned by the *Perkins* court is that involved in *City of Richmond, supra,* and similar cases; the first category is that presented by this case. See also, *Busbee v. Smith, supra,* 549 F.Supp. at 515–16; and *Allen v. State Board of Elections,* 393 U.S. 544, 567–68, 89 S.Ct. 817, 832–33, 22 L.Ed.2d 1 (1969).

The remark of the Fifth Circuit in *United States v. Hinds County School Board,* 417 F.2d 852, 858 (5th Cir.1969) that "nothing is as emphatic as zero" is particularly apt here. It would be incongruous if the City of Pleasant Grove, having succeeded in keeping all blacks out, could now successfully defend on the ground that there are no blacks in the city whose right to vote would be diluted by the annexation of white, but not black, subdivisions. This Court is not prepared to endorse such an anomalous result.[16]

That complaint would have validity if Judge MacKinnon were correct in his assumption that the Supreme Court meant to limit its condemnation of discriminatory purposes to situations where existing minority voting rights were being diluted (as distinguished from those where such an effect does not, indeed cannot, exist because blacks are completely denied the right to vote by being kept out of the particular voting area). But that assumption is clearly not correct, for it does not account for the Supreme Court's explicit reference to discriminatory purpose both in *City of Port Arthur* and in *Lockhart* (where under Judge MacKinnon's view reliance on discriminatory effect would have sufficed) or to the equally explicit reference in *Perkins v. Matthews* to revisions in municipal boundaries which keep blacks out. Viewed in that light, the portion of the *City of Port Arthur* opinion quoted by our dissenting colleague is nothing more than one illustration of the general rule that changes in voting practices which have a discriminatory purpose violate the Voting Rights Act, and it is therefore irrelevant to our holding.

**15.** To be sure, the Supreme Court there held that the "effect" prong of the Act is not violated by changes in voting laws which are not retrogressive in effect. That holding, of course, is irrelevant to the "purpose" prong.

**16.** Judge MacKinnon suggests that it follows from our holding in this case that the Voting Rights Act would be violated by the grant of a building permit for condominiums priced at a range beyond the reach of blacks. Dissent at 1463. This would be correct, however, only if a municipality's grant of a building permit were considered a change of voting practices or procedures under the Voting Rights Act. While the Supreme Court has repeatedly held that changing boundary lines by annexations constitutes a change of a "standard, practice, or procedure with respect to voting" under the Voting Rights Act, such that the preclearance requirements of section 5 of the Act must be satisfied, see, *e.g., Perkins v. Matthews, supra,* 400 U.S. at 388, 91 S.Ct. at 437, we are unaware of any decision holding that the grant of a single building permit likewise triggers the preclearance requirements of the Act. Because of the obvious differences between changing boundary lines and granting building permits, we agree with the dissent that it is unlikely that Congress intended the Voting Rights Act to apply to the latter.

However, with respect to Judge MacKinnon's broader point which the building permit example was presumably intended to prove—that neither discriminatory purpose nor an effect on individuals not currently in the particular community are enough—it is, in our view, mistaken. If it could be proved that the decision of a municipality with respect to building permits had as its purpose to keep blacks out of the particular neighborhood, its actions would violate the Fourteenth Amendment. See, *e.g., Dailey v. City of Lawton,* 425 F.2d 1037 (10th Cir.1970) which held that the Fourteenth Amendment was violated by the racially motivated denial of building permit; and *Kennedy*

■ It is also noteworthy that the Attorney General, who administers the Voting Rights Act in the first instance, has consistently objected to annexations which were the product of racially selective policies. See *Supplemental Memorandum of the United States,* pp. 2–4 and attachments. The Attorney General's interpretation of the requirements of the Voting Rights Act is, of course, entitled to considerable deference. See *Perkins v. Matthews, supra,* 400 U.S. at 390–94, 91 S.Ct. at 437–39; *United States v. Sheffield Board of Commissioners,* 435 U.S. 110, 134, 98 S.Ct. 965, 980, 55 L.Ed.2d 148 (1978). The Attorney General's objection letters were submitted to and made a part of the record of the Congress [17] at various times, including at the time when Congress recently considered the extension of the Voting Rights Act. See H.R.Rep. No. 97–227, 97th Cong.2d Sess., p. 13 (1982).[18]

■ It is thus clear from the precedents (1) that in the context of annexations, the Voting Rights Act applies if there is a discriminatory purpose irrespective of whether or not there is also a discriminatory effect and (2) that the failure to annex is a violation of the Act provided discriminatory purpose is shown.

> *Park Homes Assoc., Inc. v. City of Lackawanna,* 436 F.2d 108 (2d Cir.1971) where the court, in an opinion by Justice Clark, sustained a finding of violation of the Fourteenth Amendment where officials had rezoned property that had been selected for a housing project and declared a moratorium on new subdivisions in order to deny housing to minority families. See also, *Arlington Heights v. Metropolitan Housing Corp.,* 429 U.S. 252, 264–68, 97 S.Ct. 555, 562–65, 50 L.Ed.2d 450 (1979). Similarly, the Fifteenth Amendment is violated by a redefinition of city boundaries which is undertaken for the purpose of depriving blacks of the benefits of residence in a municipality, including, the right to vote in municipal elections. *Gomillion v. Lightfoot,* 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960); see also, *Mobile v. Bolden,* 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1979) which, like *Arlington Heights, supra,* emphasized the importance of discriminatory purpose in the context of actions designed to invoke the protection of the Fourteenth or Fifteenth Amendment. On this motion for summary judgment, we must, of course, assume

This does not mean, of course, that Pleasant Grove or any other community would be required to annex contiguous areas merely because such areas may be inhabited by blacks. But it does mean that a community may not annex adjacent white areas while applying a wholly different standard to black areas and failing to annex them based on that discriminatory standard. See *Gomillion v. Lightfoot,* 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960). If a community subject to the Voting Rights Act cannot demonstrate that it is not engaged in such discrimination, the Attorney General and the Court will not grant clearance for the annexation of the white areas.

For the reasons stated, it is this 3rd of August, 1983,

ORDERED That plaintiff's motion for summary judgment and its motion for partial summary judgment be and they are hereby denied.

MacKINNON, Senior Circuit Judge (dissenting):

Neither annexation here *changes* the voting rights of a single member of any minority group. Therefore, because there is no change whatsoever in the voting rights of any member of any minority, I cannot agree with the majority that the two an-

> that the plaintiff will be able to prove discriminatory purpose, and it is clear on the basis of the precedent cited that, upon such proof, a violation of the Fifteenth Amendment would be established. There is no basis for an interpretation of the Voting Rights Act which would provide fewer protections than those provided by the Fifteenth Amendment, for that Act was enacted pursuant to the power vested in Congress by section 2 of the Amendment to provide *additional* protections in that vital area. See *South Carolina v. Katzenbach,* 383 U.S. 301, 326–27, 337, 86 S.Ct. 803, 817–18, 823, 15 L.Ed.2d 769 (1966).

**17.** Interestingly, a case summary of the Pleasant Grove litigation was included in one of these reports.

**18.** For the significance of the reenactment of the statute under conditions where Congress voices its approval of administrative interpretation, see *United States v. Sheffield Board of Commissioners, supra,* 423 U.S. at 134, 98 S.Ct. at 980.

nexations at issue in this case are "violation[s] of the [Voting Rights] Act provided discriminatory purpose is shown." Maj. Op. at 1460.

The majority opinion refers to three Supreme Court decisions holding certain annexations subject to preclearance under section 5 of the Act, *City of Port Arthur v. United States,* —— U.S. ——, 103 S.Ct. 530, 74 L.Ed.2d 334 (1982); *City of Richmond v. United States,* 422 U.S. 358, 95 S.Ct. 2296, 45 L.Ed.2d 245 (1975); *Perkins v. Matthews,* 400 U.S. 379, 91 S.Ct. 431, 27 L.Ed.2d 476 (1971), but in each of those cases the annexations clearly *changed existing voting rights of minorities.* Typical of these is *City of Richmond,* where the Court held:

Section 5 forbids *voting changes* taken with the purpose of denying the vote on the grounds of race or color. Congress surely has the power to prevent such gross racial slurs, the only point of which is 'to despoil colored citizens, and only colored citizens, of their *theretofore enjoyed voting rights.'* ... *An annexation proved to be of this kind* [a change in the voting rights· of some minority citizens] and not proved to have a justifiable basis is forbidden by [section] 5 whatever its actual effect may have been or may be.

*City of Richmond v. United States, supra,* 422 U.S. at 378–79, 95 S.Ct. at 2307–08 (quoting *Gomillion v. Lightfoot,* 364 U.S. 339, 347, 81 S.Ct. 125, 130, 5 L.Ed.2d 110 (1960)) (emphasis added). Thus the principles these cases announce are not applicable to this case where there is no change in the existing voting rights of any single minority individual.

The majority relies upon the following *partial* quotation from *City of Port Arthur:*

In the *City of Port Arthur, Texas v. United States,* [—— U.S. ——] 103 S.Ct. 530, 535 [74 L.Ed.2d 334] (Dec. 13, 1982), the court held that

... even if [a practical] electoral scheme might otherwise be said to reflect the political strength of the minority community, the plan would nevertheless be invalid *if adopted for racially-discriminatory purposes* ... (emphasis added).

Maj. Op. at 1458. In failing to quote the complete sentence the majority grossly misstates the Supreme Court's ruling and asserts that an annexation made with a discriminatory purpose—regardless of effect—violates the Voting Rights Act. *Id.* at 1458–1459.

The complete quotation from the Supreme Court opinion in *City of Port Arthur v. United States, supra,* 103 S.Ct. at 535–36 (emphasis added), reads as follows:

[E]ven if the 4–2–3 electoral scheme might otherwise be said to reflect the political strength of the minority community, the plan would nevertheless be invalid if adopted for racially discriminatory purposes, *i.e., if the majority-vote requirement in the two at-large districts had been imposed for the purpose of excluding blacks from any realistic opportunity to represent those districts or to exercise any influence on council members elected to those positions.*

A fair reading of this sentence does *not* support the asserted position of my colleagues. What the Court is truly saying is that an electoral scheme will be denied preclearance, even if minority votes are properly represented in the apportionment, *if it is continued with an electoral voting scheme that includes a discriminatory majority voting requirement in at-large districts imposed for the purpose of excluding minorities from any realistic opportunity to represent those districts.* The incomplete quotation from *City of Port Arthur* thus does not fairly represent the factual basis of the decision or the ruling expressed by the Supreme Court.

*Perkins v. Matthews,* 400 U.S. 379, 91 S.Ct. 431, 27 L.Ed.2d 476 (1971), relied on by the majority, is not contrary. There the annexation increased the number of eligible voters and diluted the weight of minority votes. Neither fact exists here. The Court noted that § 5 of the Voting Rights Act "was designed to cover *changes* having a potential for racial discrimination in voting, and such potential inheres in a *change in the composition of the electorate affected by an annexation."* *Id.* at 388–89, 91 S.Ct. at 437 (emphasis added). Clearly the Court

was concerned that "by including certain [actual] voters within the city and leaving others outside" an annexation could serve as a means for a community to discriminate against minority voters *in the community* by changing the composition of the electorate to their detriment. *Id.* at 382 n. 4, 388–90, 91 S.Ct. at 434 n. 4, 436–37. See Maj. Op. at 1458–1459.

The majority also contends that *City of Lockhart v. United States,* —— U.S. ——, 103 S.Ct. 998, 74 L.Ed.2d 863 (1983) supports its conclusion, but in that case the Supreme Court reversed a three-judge district court panel and "conclude[d] that the *election changes* introduced by the 1973 Lockhart City Charter will not have the effect of denying or abridging the right to vote on account of race, color or membership in a language minority group." *Id.* 103 S.Ct. at 1004. In so holding, the Court adopted the position of Chief Judge Spottswood Robinson of the United States Court of Appeals for the District of Columbia Circuit, who dissented in *Lockhart* because "the voting strength of Lockhart's minorities, whether or not enhanced, would not be diminished one whit." *City of Lockhart v. United States,* 559 F.Supp. 581, 595 (D.D.C. 1981) (S. Robinson, C.J., dissenting) (quoted in *City of Lockhart v. United States, supra,* 103 S.Ct. at 1004). As the majority recognizes, the Court did not consider the "purpose" prong of section 5 in *Lockhart* because the district court panel had not reached that issue. See *City of Lockhart v. United States, supra,* 103 S.Ct. at 1001 & n. 4; Maj. Op. at 1458. However, unlike the other cases relied upon by my colleagues, *Lockhart* involved a fact situation where the existing voting rights of minorities were being altered. Judicial decisions such as *Lockhart* which involve factual situations where minority voting rights are changed are simply not applicable to situations where there is no change whatsoever in the existing voting rights of minorities and where any changes which might take place in the future are speculative.

The two annexations at issue in this case simply have not changed the voting rights of minorities. The larger, 1979 annexation involves vacant land and does not change the voting rights of a single person, much less minorities. The smaller, 1971 annexation incorporated one family of approximately fourteen whites into the City. While this annexation results in at least a *de minimus* change in voting rights in the City of Pleasant Grove, it does not change any existing minority voting rights because there are no minority voters in the City or in any of the annexed territory.[1] Since the annexations at issue do not *change* any existing minority voting rights and the Voting Rights Act only applies when there is some "retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise," *Beer v. United States,* 425 U.S. 130, 141, 96 S.Ct. 1357, 1364, 47 L.Ed.2d 629 (1976), it is my view that the two annexations, one of which is inhabited by one non-minority family, cannot constitute a violation of the Voting Rights Act, regardless of the motives of the City. Accordingly, summary judgment is appropriate.

I do not wish to suggest that the motives of the City of Pleasant Grove are pure. I agree with the majority that, from the facts in the record, "a court could appropriately draw the inference that the City of Pleasant Grove had and has the purpose to discriminate against blacks with respect to voting as [well as] with respect to other subjects." Maj. Op. at 1457. There may, in fact, be actionable constitutional violations occurring in the City. See *Gomillion v. Lightfoot,* 364 U.S. 339, 341, 81 S.Ct. 125, 127, 5 L.Ed.2d 110 (1960).[2] Such violations

---

1. I find it significant that the Justice Department failed to object to several annexations of the City of Bessemer, Alabama, because they involved "areas that are not populated or areas the population of which have at most a *de minimus* effect on minority voting strength." Defendant's Supplemental Memorandum, Attachment 6, at 2–3. As the majority recognizes, the Attorney General's interpretation of the Voting Rights Act is "entitled to considerable deference." Maj. Op. at 1460.

2. Of course, *Gomillion* involved the *elimination* of practically all Negro voters from the elective franchise in the City of Tuskegee, Alabama. As the Supreme Court remarked:
   The essential inevitable effect of this redefinition of Tuskegee's boundaries is to remove

are not issues before us.[3] The purpose of § 5 is to prevent communities from avoiding the Act's requirements—elimination of literacy tests and other like voting qualifications—by simply enacting slightly different voting qualifications having the same discriminatory impact. *Allen v. State Board of Elections,* 393 U.S. 544, 548–50, 89 S.Ct. 817, 822–23, 22 L.Ed.2d 1 (1969). Where, as here, an annexation in no way changes existing voting rights of minorities, or even directly involves a single identifiable member of any minority group, the Voting Rights Act is not implicated.

Support for summary judgment in this case is also found in the language of section 5 itself; the statutory scheme does *not* contemplate its application to annexations of vacant property. Section 5 provides:

> Whenever a State or political subdivision ... shall enact or seek to administer any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1964 ... such State or subdivision may institute an action in the United States District Court for the District of Columbia for a declaratory judgment that such qualification, prerequisite, standard, practice, or procedure does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color, or [membership in a language minority group], and *unless and until the court enters such judgment no person shall be denied the right to vote for failure to comply with such qualification, prerequisite, standard, practice or procedure. . . .*

42 U.S.C. § 1973c (1976) (emphasis added). The italicized language setting forth the enforcement provision indicate that Congress only intended the Act to apply where individual minority voters were actually involved.

The question in this action is whether the annexation of vacant land to the west and north of the City of Pleasant Grove is a "qualification, prerequisite, standard, practice or procedure" having the purpose or effect of denying or abridging the right to vote on account of race or color, or membership in a language minority group. The mere annexation of property upon which no voters reside cannot be termed "a qualification, prerequisite, standard, practice, or procedure with respect to voting" because the preclearance and enforcement requirement of § 5 contemplates situations where at least some minority individuals' voting rights are changed by the "qualification, prerequisite, standard, practice, or procedure" at issue. The language of the statute thus implicitly indicates that Congress did not intend section 5 to apply to annexations having no impact on the voting rights of minorities, such as the Western and Glasgow additions to the City of Pleasant Grove.

If the majority's interpretation of the Act were correct, the granting of a building permit by the City of Pleasant Grove for condominiums estimated to sell for $125,000 each could be denied preclearance under section 5 of the Voting Rights Act if nonresident minorities demonstrated that they could not afford to purchase the condominiums. In my view Congress did not intend

---

from the city all save only four or five of its 400 Negro voters while not removing a single white voter or resident. *Gomillion v. Lightfoot, supra,* 364 U.S. at 341, 81 S.Ct. at 127. *Gomillion,* involving as it does the "unequivocal withdrawal of the vote solely from colored citizens," is a far cry from the annexations at issue here. *Id.* at 346, 81 S.Ct. at 130.

**3.** I cannot agree with the majority's suggestion that the Voting Rights Act incorporates *all* of the protections of the Fifteenth Amendment, as well as providing "*additional* protections in that vital area." Maj. Op. at 1460 n. 16 (emphasis in original). The Act does provide some additional protections for minority voters; section 5 does so by placing the burden on *municipalities* to demonstrate, *prior* to implementation of changes in the existing voting rights of minorities, that such changes do "not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color ...." 42 U.S.C. § 1973c (1976). Nothing in the Voting Rights Act, however, imposes the burden on municipalities to *disprove* allegations of violations of the Fourteenth and Fifteenth Amendments of the sort involved in the cases cited by the majority. See Maj. Op. at 1459–1460 n. 16.

section 5 to be given such an expanded construction; the intent expressed in the language of section 5 does not support such an interpretation.

I therefore find it necessary to dissent. The majority is attempting to extend the Act to a factual situation to which it was never intended to apply.