## CITY OF PLEASANT GROVE, Plaintiff,

v.

## The UNITED STATES of America, Defendant.

### Civ. A. No. 80–2589.

United States District Court, District of Columbia.

Oct. 25, 1985.

Thomas G. Corcoran, Jr., Donald J. Cronin, Corcoran, Youngman & Rowe, Washington, D.C., for plaintiff; Thomas N. Crawford, Jr., Cooper, Mitch & Crawford, of counsel, Birmingham, Ala.

Gerald W. Jones, Paul F. Hancock, Jeremy I. Schwartz, John K. Tanner, Voting Section, Civil Rights Div., U.S. Dept. of Justice, Washington, D.C., for defendant.

## OPINION

HAROLD H. GREENE, District Judge.

On October 9, 1980, the City of Pleasant Grove, a community in Jefferson County, Alabama, brought this action under section 5 of the Voting Rights Act of 1965, 42 U.S.C. § 1973c, seeking a declaration that the annexation by the city of the so-called "Western Addition" did not have the purpose or effect of denying or abridging the right to vote on account of race or color. In March 1982, plaintiff moved for summa-

ry judgment,[1] and on August 3, 1983, after a hearing, the Court denied plaintiff's motion. *City of Pleasant Grove v. United States,* 568 F.Supp. 1455 (D.D.C.1983).

The Court's opinion on the motion and Judge MacKinnon's dissent focused on the question whether a community without black voters would be in violation of the Act by annexing areas inhabited by whites while refusing to annex similarly situated, contiguous areas inhabited by blacks. On that issue, the Court held that, in the context of annexation, a violation occurs upon a showing of discriminatory *purpose* alone, and that it was not significant in terms of the Voting Rights Act that, since there were no black voters in the City of Pleasant Grove, there could be no dilution of the voting rights of blacks and hence no discriminatory *effect.* The Court further decided that a political entity may not annex adjacent white areas while applying a wholly different standard to adjacent black areas and failing to annex them based upon that discriminatory standard. 568 F.Supp. at 1460.

That decision is, of course, the law of the case. *Fogel v. Chestnutt,* 668 F.2d 100, 108–09 (2d Cir.1981); *Handi Investment Co. v. Mobil Oil Corp.,* 653 F.2d 391, 392 (9th Cir.1981); *Major v. Benton,* 647 F.2d 110, 112 (10th Cir.1981); *United States v. Fernandez,* 506 F.2d 1200, 1204 (2d Cir. 1974); *White v. Murtha,* 377 F.2d 428, 431–32 (5th Cir.1967); *Schupak v. Califano,* 454 F.Supp. 105, 114 (E.D.N.Y.1978). See generally 1B *Moore's Federal Practice* paragraphs 0.404[1], 0.404[4.–1].

The action is now before the Court on the merits and, as the plaintiff, the City of Pleasant Grove has the burden of proof. *City of Rome v. United States,* 446 U.S. 156, 162, 183–87, 100 S.Ct. 1548, 1554, 1564–67, 64 L.Ed.2d 119 (1980); *City of Richmond v. United States,* 422 U.S. 358, 362, 95 S.Ct. 2296, 2299, 45 L.Ed.2d 245 (1975); *Georgia v. United States,* 411 U.S. 526, 538, 93 S.Ct. 1702, 1709, 36 L.Ed.2d 472 (1973); *City of Port Arthur v. United States,* 517 F.Supp. 987, 1010–11 (D.D.C. 1981), *aff'd,* 459 U.S. 159, 103 S.Ct. 530, 74 L.Ed.2d 334 (1982); *Mississippi v. United States,* 490 F.Supp. 569, 581 (D.D.C.1979), *aff'd,* 444 U.S. 1050, 100 S.Ct. 994, 62 L.Ed.2d 739 (1980); *City of Petersburg v. United States,* 354 F.Supp. 1021, 1027 (D.D.C.1972), *aff'd,* 410 U.S. 962, 93 S.Ct. 1441, 35 L.Ed.2d 398 (1973).

It is in this procedural framework that the Court now considers the factual issues.

## I

During its history, Pleasant Grove approved the following four annexation requests: a parcel of land to the southeast of the city (1945); land in the northern, southern, and western areas (1967); the Glasgow Addition (1971); and the Western Addition (1979).[2] None of these areas had any black residents. During the same period, the city rejected annexation petitions from the Woodward School (August, 1971),[3] the Pleasant Grove Highlands (April 18, 1979); and the Dolomite area (October, 1979).

---

1. The complaint initially sought declaratory relief only with respect to the annexation of the Western Addition, and on May 15, 1981, plaintiff filed a motion for summary judgment as to this single annexation. On October 7, 1981, the Court ordered plaintiff to amend its complaint to include a second annexation, accomplished in 1971, which had not been precleared with the Department of Justice—the so-called "Glasgow Addition." Plaintiff amended its complaint and then moved for partial summary judgment as to the Glasgow Addition, requesting a finding that its annexation, too, did not have the purpose or effect of denying or abridging the right to vote on account of race or color. That annexation is therefore likewise before us.

2. In August of 1969, a committee from Sylvan Springs and the West Grove area (both inhabited by whites) requested Pleasant Grove to consider consolidation with the former and annexation of the latter. This petition for annexation was actively pursued and facilitated by Pleasant Grove, but the annexation was blocked by the United States Steel Corporation, which, as an intervening property owner, had the legal right to do so. This Opinion constitutes the findings of fact and conclusions of law required by Rule 52, Fed.R.Civ.P.

3. The city refused to annex the site on which the "black" Woodward School was located in order to avoid federal court school desegregation orders.

Each of these areas has been identified as a "black" area.[4]

The annexations directly at issue in this proceeding are those of the Western Addition (Western), the Glasgow Addition (Glasgow), and the Pleasant Grove Highlands (Highlands). The basic rationale offered by Pleasant Grove in discharge of its burden of proof is that its decisions to annex the "white" Western[5] and Glasgow areas, but not the "black" Highlands, were based not on race but on the city's economic self-interest.

In support of that rationale, Pleasant Grove adduced evidence[6] tending to show that, when the residents of the Highlands requested annexation (some two months after the annexation of Western), the mayor of Pleasant Grove appointed a committee to investigate. That committee, it is said, reported to the City Council that annexation would not be financially advantageous, and a second committee later likewise concluded that annexation would be economically costly to the city.[7] The principal substantive contentions Pleasant Grove is making in support of these conclusions are (1) that by annexing the Highlands, it would give up approximately $59,000 in development fees,[8] and (2) that the Highlands, unlike the "white" areas which had recently been annexed, requires more than its per capita share of City revenues, particularly in the form of police, fire, and sanitation services. We find, based on the evidence, that these contentions are without merit, and that they are a mere pretext for race-biased annexation decisions.

## II

First. Neither in connection with the Highlands' petition nor at any other time did Pleasant Grove conduct an economic study to determine the advantages and disadvantages of a particular annexation; all the economic conclusions reached in this regard were developed after the fact. The evidence clearly shows that the City did not assess the economic or other impacts of annexation prior to its decision not to annex the Highlands,[9] and that it likewise performed no such studies in connection with its decisions to annex the Western and the Glasgow areas.

Second. Pleasant Grove's reliance upon the determination of its so-called "Annexation Committee"—that annexation of the Highlands would be too costly—is unpersuasive for other reasons as well. Although the City asserts that the committee was established in March, 1981 to consider economic impacts, committee members have testified that they were not notified of their appointments until one year later.[10]

4. Pleasant Grove also refused to annex the Kohler (1969) and Westminster (1977–78) parcels which were inhabited by whites, because such annexations might have a "mushroom effect" leading to subsequent annexations of adjacent black areas. Patrick Deposition of April 2, 1981 at 55–56, 102–104.

5. While the Western Addition is undeveloped, its location and the City's plans indicate that it is likely to be developed for use by white persons only.

6. The parties submitted to the Court their affidavits, depositions, answers to interrogatories, admissions, and exhibits, and they stipulated that the Court may render its decision on the merits based on that record without the need for the taking of additional evidence at a trial.

7. The chairman of the second committee testified that he decided to take no action on the request because no one had approached the City · since his election to the Council in October, 1980; the matter was already in litigation; and

he did not want to make any decision which would expose him to a race discrimination suit. Mosley Deposition of January 11, 1984, Part I at 15, Part II at 23–24, Plaintiff's Brief at 9.

8. Plaintiff's Brief at 9. Sarah A. Mays, the City Clerk of the City of Pleasant Grove and the Secretary-Treasurer of the Utilities Board, stated that the City would give up $45,820 in development fees if it annexed the Highlands (which consists of 79 houses) instead of building those houses within the city. Mays Deposition of January 13, 1984 at 19 and Exhibit 14 thereto.

9. Or intend its decisions not to annex the Dolomite, Kohler, and Westminster areas. See note 4, *supra*.

10. The Annexation Committee was made up of James (or "Pete") Mosley, Clyde Morgan, and Joe Cooper. Mosley averred that he was notified of the formation of the Committee shortly before receiving the Mayor's letter with enclo-

It is likewise established that, if the committee met at all, it did so only once and then only on an informal basis, and that it never gathered its own information, but what data it had were provided to it by the Mayor from various city department heads who had already prejudged the issue.[11] The committee never questioned these individuals regarding economic issues; it generated no documents; and it made no official report to the City Council. Based on these uncontroverted facts, it is difficult to escape the conclusion that reliance by the City on the committee's recommendation for its decision not to annex Pleasant Grove Highlands is a sham.[12]

Third. Substantively, the economic justification presented to the Court for the City's failure to annex the Highlands is no more persuasive.[13] The factors that have been cited in that regard are fire protection, streets and sanitation, police protection, and revenues from development fees.

A. The Pleasant Grove fire chief has stated that the annexation of the Highlands would have generated the need for three additional firefighters/paramedics and one additional rescue truck, at considerable cost to the city. That projection was entirely without factual basis, for the city was already providing free fire, police, and paramedic services to the Highlands, area, and thus *no* additional monies would have been needed as a consequence of annexation. The fire chief's projection is dubious for another reason as well: the anticipated cost for serving the 79 homes in the Highlands was more than the estimated cost of serving the 700 projected homes in the Western addition although the former is more easily accessible than the latter.

B. Similar problems exist with respect to the City's findings concerning the respective costs of providing street and sanitation services to the Highlands as opposed to the Western Addition. Those responsible for calculating the costs of these services applied entirely different cost methods for the needs of the Highlands than they did for those of the Western Addition. If the same method of calculating costs are applied to both areas, the cost to the city would be, depending upon the formula used, either $20,000 for the Western Addition and zero for the Highlands,[14] or $81,-

---

sures concerning the estimated costs of providing services to the Highlands, dated May 24, 1982. Mosley Deposition of January 11, 1984, at 10–11.

Morgan likewise stated that he was appointed to the committee at approximately the same time as the letter was sent. Morgan Deposition of January 11, 1984 at 7. And Cooper, the third alleged member of the Committee, has no recollection of ever being appointed or serving on the second committee. Cooper Deposition of January 11, 1984 at 7–8.

11. In his letter to the Committee Chairman, the Mayor gave his opinion that "it is the general consensus of all concerned that the costs of annexing [the Highlands] would be prohibitive, based upon the projected revenues that would be derived from same." Letter to Mr. Pete Mosley, Chairman, from Mayor Donald R. Morrison dated May 24, 1982. Govt's Exhibit 1 to January 11, 1984 Mosley Deposition.

12. Indeed, only one member of the Committee, Pete Mosley, reached a conclusion concerning the desirability of annexing the Highlands, and his decision was based largely, if not entirely, on the fact that the matter was in litigation. See January 11, 1984 Deposition of Mosley, Part I at 15, 18–20, Part II at 23–24.

13. In connection with the City's reliance on the economic disadvantages allegedly flowing from an annexation of the Highlands, it is interesting to note that the Glasgow annexation, which the City did effect, was an economic drawback to it because of its inaccessibility to city fire and police services. That area, in fact, was annexed solely because of the personal relationship between city officials and the Glasgows who were described as "fine people" whom the city residents "would be proud to have in Pleasant Grove." Deposition of Councilmember Clyde E. Morgan of December 17, 1981, at 15, 17–18. Needless to say (see Part III *infra*), there were no expressions of opinion from city officials that the black inhabitants of the Highlands were "fine people" whom the City "would be proud to have" as members of the community.

14. Plaintiff stated that, as a result of anticipated development in the Western Addition, it would have to hire two additional sanitation workers at a cost of $10,000 each per year. No such additional personnel would be needed to service the 79 homes in the Highlands, however, because the residents offered to continue their private garbage collection after annexation. Graham Deposition of April 7, 1981 at 13 and 34. In any event, the City Clerk testified that

900 for the Western Addition and $6,917.24 for the Highlands.[15] In short, under either method, the cost of providing street and sanitation services to Western far exceeds the cost of providing such services to the Highlands.

C. On the issue of police protection, the City's high cost estimates for the Highlands were based primarily upon the view expressed by the police chief, that the black residents of the Highlands were more "crime prone."[16] Actually, to the extent that the statistics support that assessment at all,[17] they are explained by the fact that the Highlands was a "new" neighborhood still lacking cohesion.[18] In any event—as is true with respect to the provision of fire and paramedic service—the Pleasant Grove police department already responds to calls in the Highlands, and the annexation therefore should not generate any additional costs.[19]

D. As concerns finally the question of revenues from new development, Pleasant Grove relies primarily upon the fact that if the city brought in the 79 already-existing homes in the Highlands, as distinguished from having an equal number of new houses built within the city, it would lose $45,-820 in development fees. That argument fails entirely to consider, however, that annexation of the Highlands would generate immediate ad valoram tax revenues for the city, and that the Highlands area contains sufficient undeveloped land to allow the construction of 80 new homes.

Pleasant Grove also estimated that the annexation of the Western Addition would generate anywhere from $768,250 to $1,424,500 in development fees over a four year period,[20] in the form of building permits, subcontractors' licenses, increased property taxes, and the like. These figures, however, are shown by the record to be highly inflated. For example, the City's estimated annual tax revenue for the new Western homes exceed those of the City's most expensive neighborhoods. Moreover, on economic grounds other than development fees, the annexation of the Western Addition appears to be more costly to the

the Department staff is currently underutilized. Mays Deposition of January 13, 1984 at 44–45.

15. These figures are based on the 1980 average cost of street and sanitation services per household of $87.56. George Parkin, Superintendent Streets and Sanitation Department, used this figure to calculate the cost of providing services to the Highlands. Government's Exhibit 1 to Mosley Deposition of January 11, 1984.

16. Police Chief Robert L. Love deposition of January 12, 1984 at 18.

17. Chief Love based his opinion on a comparison of the number of burglaries committed in the Highlands between July 20, 1978 and January 3, 1979 with the number of burglaries committed in the City of Pleasant Grove during 1980. The available data for theft during this same high-crime period, however, indicates that the Highlands had a lower incident of theft than did Pleasant Grove. Only one theft was reported in the Highlands (79 homes, .013 thefts per household), whereas 79 thefts were reported in Pleasant Grove (2,400 homes, .033 thefts per household). Plaintiff's Exhibit 1 to Waldon Deposition of January 12, 1984 and attachments.

18. January 12, 1984 Deposition of Detective Sergeant Waldon at 14–15. Burglaries in the Highlands declined from 25 in 1978 to 16 in 1979, to 13 in 1980, and to 2 in the first nine months of 1981. Plaintiff's Exhibit 1 to Waldon Deposition and attachments.

19. No new police costs were projected for the Western Addition even though Chief Love testified that development of this area would also require new resources. Love deposition of January 13, 1984 at 9–10.

20. Plaintiff's counsel stated in a letter of August 20, 1980 to the government that the City's total estimated revenue from development fees over the next four years would be $768,250. Government Exhibit 1 to Mosley Deposition of January 11, 1984. In a letter dated July 14, 1980 to plaintiff's counsel, the Mayor of Pleasant Grove estimated that the development fees and receipts expected from the annexed area for the next four year period would be $1,014,600. Government Exhibit 3 to Mosley Deposition. A month earlier, however, the Mayor had estimated that the City would receive $1,424,500 in development fees from the annexation of Western. Government Exhibit 2 to Mosley Deposition.

City than the annexation of the Highlands.[21]

We find that the economic justification advanced by Pleasant Grove for its annexation practices is flawed both procedurally and substantively, and that it is no more than a transparent attempt to put a valid gloss on decisions which plainly had a racial purpose.

## III

In addition to the evidence of the disparate approach Pleasant Grove took with respect to almost every phase of its economic analysis of the proposed annexations, there is ample evidence before the Court that the City adopted racially-discriminatory policies with respect to matters other than annexation. As a matter of law, the Court may, and it does, infer on the basis of this evidence as well that racial bias was the purpose of Pleasant Grove's annexation policy.[22]

From the 1940s to the present, Pleasant Grove's housing and zoning policies have been designed to exclude blacks from the City. This was done either directly[23] or through its efforts to exclude apartment construction (in the belief that apartment housing was likely to be occupied by blacks).[24] Moreover, Pleasant Grove has managed to maintain an all-white residential community by operating a dual white-black housing market through a variety of devices, such as advertising and marketing directed exclusively to white buyers, and racial steering.[25]

Pleasant Grove has likewise made clear its policy of hostility to the presence of blacks in subjects other than housing. The City has never hired a black person, preferring to draw its employees from as far away as fifty miles rather than to hire blacks living in surrounding Jefferson County, which is one-third black. When a federal court in 1969 required the County to abandon its segregated school system,[26] Pleasant Grove voted to secede from the county school system on the evening of the very day the court's order was issued. The City established its own separate "white" school system, financing it with extraordinary taxes,[27] and funds diverted from the

---

**21.** Thus, the overall projected cost of annexing Western fails to take into account such necessary construction as a new fire station, a major traffic artery, and a new neighborhood park.

Beyond that, even if it were to be assumed that Pleasant Grove would not fare as well with respect to the one item of development income by annexing the Highlands as by failing to do so, the City clearly did not know this when it rejected the Highlands petition.

**22.** See *Rogers v. Lodge,* 458 U.S. 613, 624–26, 102 S.Ct. 3272, 3279–80, 73 L.Ed.2d 1012 (1982); *Busbee v. Smith,* 549 F.Supp. 494, 516–17 (D.D. C.1982), *aff'd,* 459 U.S. 1166, 103 S.Ct. 809, 74 L.Ed.2d 1010 (1983).

**23.** In the early 1940s, the Pleasant Grove City Council acted to prevent the construction of a "colored housing project" within the City, and it directed the City attorney to draft a zoning ordinance designed to "restrict colored property." See Minutes of Pleasant Grove Town Council Meeting of November 3, 1941. In fact, the Town Clerk was instructed to write Mr. Pill of the Woodward Iron Co., that the City sincerely desired that he would not sell any land within the corporate limits for a "colored housing project," and that it highly encouraged the project to be "built outside *so as to avoid conflict with our zoning ordinance.* " Exhibit 12 to Response of the United States to Plaintiff's Motion for Summary Judgment filed on March 26, 1982 (hereinafter Government's Response Brief) (emphasis in the original). In the Town Council meeting of November 1, 1943, the Town Clerk was instructed to contact the City attorney concerning a zoning ordinance to restrict "colored" property and business districts and white residential property within the corporate limits. Exhibit 13 to Government's Response Brief.

**24.** See Milton C. Russell Deposition of April 3, 1981 at 22–24. See also Bobby R. Patrick Deposition of December 17, 1981 at 40. The City's restrictive zoning ordinance prohibiting the construction of apartments was struck down by a federal court on the ground that it had a racially-exclusionary effect. *Wheeler v. City of Pleasant Grove,* C.A. No. 78–F–1150–S (N.D.Ga.1979).

**25.** See Joe Nathan Dickson Deposition of April 17, 1981 at 8–14, 17–18, 27–29; Albert Mason Deposition of April 7, 1981 at 21–22, 26–27; Billy F. Graham Deposition of April 7, 1981 at 7–10.

**26.** *Stout v. Jefferson County Board of Education,* C.A. No. 65–396 (N.D.Ala.1969).

**27.** In addition to enacting higher sales and other taxes, the City Council raised the ad valorem property tax rate to the highest level in Jefferson County.

municipal utility system.[28] These actions, and others,[29] demonstrate that the City of Pleasant Grove has attempted to exclude blacks from becoming residents of the City and all facets of City life, including voting in municipal elections, and that it has, in fact, succeeded in doing so. As the *Rogers* and *Busbee* cases, cited *supra*, hold, such actions are valid evidence of discriminatory purpose in a voting rights action.

The mass of evidence of a specific racially-biased annexation policy, supported by what must be, for this day and age, an astonishing hostility to the presence and the rights of black Americans, far overshadows and outweighs the City's feeble effort to portray its annexation policy as economically motivated. We find that the economic rationale advanced by Pleasant Grove is pretextual, and that the city has wholly failed to carry its burden of establishing that its annexation policy does not have the purpose of denying or abriding the right to vote on account of race or color.[30]

For these reasons, it is the judgment of this Court that the request of plaintiff for preclearance of the annexations of the Western and the Glasgow Additions pursuant to section 5 of the Voting Rights Act must and will be denied.

MacKINNON, Senior Circuit Judge (dissenting):

The City of Pleasant Grove is a small municipal corporation in Alabama which is a suburb of the City of Birmingham. At times here relevant it had a population of 7,086, all of whom were white citizens except for one Oriental and 32 blacks who live in two nursing homes and require 24 hour-a-day supervision. There are no black voters in Pleasant Grove. This case involves primarily the annexation of the Western Addition, a large tract of *completely vacant land* that is contiguous to the western boundary of the City. The 1969 annexation of the much smaller Glasgow Addition, inhabited only by the white citizens of the Glasgow family, is also involved in this case. Despite the absence of any affirmative duty under section 5 of the Voting Rights Act for an electoral district to improve the position of minority voters or to reduce the strength of a majority, my colleagues decide that these annexations violate the *Voting Rights Act* because the City Council did not *subsequently* annex an area south of the City that is *inhabited* completely by black citizens. The majority have thus in effect denied preclearance of the annexation of both the Western and Glasgow Additions. While Pleasant Grove has a history of past racially discriminatory conduct, in my opinion subject annexations do not violate the Voting Rights Act. Pleasant Grove, moreover, has clearly met its burden by showing an economic justification for the annexation of the Western Addition.

I.

The Western Addition is a tract of *completely vacant land* contiguous to the western boundary of Pleasant Grove. The City of Pleasant Grove owns 50 acres of the land and the Mead Corporation and Gary H. Dobbs, Sr. owns the remainder, estimated from the map at approximately 389 acres. In the latter part of 1978, these owners contacted the mayor of Pleasant Grove and requested annexation of the Western Addition to Pleasant Grove. The

---

**28.** That separate school system was ultimately abolished in 1972, by another federal court order. *Stout v. Jefferson County Board of Education*, No. 72–1102, *aff'd*, 466 F.2d 1213 (5th Cir.1972).

**29.** Among other things, the Pleasant Grove City Council authorized the formation of a chapter of the White Citizens Councils, it thanked Governor George Wallace for his fight against desegregation, and it condemned the Birmingham Bar Association for its expression of moral support to Judge Samuel Pointer of the U.S. District Court for the Northern District of Alabama for his efforts in *Stout*.

**30.** Even if the burden of proof were on the United States—which it is not—we would have had no difficulty in finding that the annexation policy of Pleasant Grove is, by design, racially-discriminatory in violation of the Voting Rights Act.

proposal came before the Municipal Council on February 5, 1979. On that date the Council adopted a resolution, four to one (abstention), annexing the Western Addition. Since the Western Addition was completely vacant land with no residents, and thus no person would be made a resident of Pleasant Grove without an opportunity to vote on the issue, the local state senator introduced legislation in the Alabama legislature to formalize the annexation. The bill was advertised in local newspapers in February and March 1979.[1]

Shortly thereafter, some residents of nearby West Smithfield Manor[2] ("Smithfield") filed a petition jointly with some citizens of the adjacent "Five Acre Road" area (collectively "petitioners") requesting annexation to Pleasant Grove. Petitioners' areas are inhabited completely by black citizens. The petitioners' request came before the Council on May 7, 1979, and was referred to a committee. The Smithfield petitioners explained that they sought annexation to Pleasant Grove because, according to the newspapers, Pleasant Grove was withdrawing their free fire protection. The continuation of paramedic services was also in doubt. At a meeting of the Pleasant Grove Council on June 18, 1979, however, the Council voted to continue providing free fire protection to Smithfield, and later paramedic services were also continued. The Council took no further action on petitioners' request for annexation.

The Attorney General denied preclearance for the annexation of the Western Addition because the predominantly black Smithfield and the Five Acre Road areas had not been annexed by Pleasant Grove. Pleasant Grove subsequently brought in this court an action under section 5 of the Voting Rights Act of 1965, 42 U.S.C. § 1973c (1982), seeking a declaratory judgment that the annexation of the vacant land in the Western Addition did "not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color...."

Pleasant Grove later amended its complaint, pursuant to order of this court, to include the much smaller annexation 10 years before, in 1969, of the Glasgow Addition, which had not previously been approved. The Glasgow Addition is contiguous to Pleasant Grove on its northern boundary and, according to measurement of the map, comprises an area of slightly less than 40 acres. In 1969 the area contained four houses all belonging to the Glasgow family. Two houses have since been added. The population was 14 in 1969 and is currently 20; all are members of the Glasgow family, and are white. Otherwise the area is completely devoid of inhabitants.

Initially this court denied plaintiff's motion for summary judgment, *City of Pleasant Grove v. United States*, 568 F.Supp. 1455 (D.D.C.1983), and the matter then came on for hearing on the merits. The majority today holds that the City's proposed annexation violates the Voting Rights Act. Although the City of Pleasant Grove has a history of racial discrimination in other respects, in my opinion, it cannot be said that the City has violated the Voting Rights Act by subject annexations. A violation of the Act requires a "den[ial] or abridg[ement]" of voting rights on account of race or color." Incapable of finding any such effect, the majority finds a violation based on past racial discrimination in respects other than voting and on bare speculative future *illegal* discrimination in other respects that arguably would result in *speculative* dilution. As is demonstrated below, however, this conclusion is based on a number of assumptions that in truth are not supported by the record or by reason.

II.

As stated above, the annexed 430 acre Western Addition is completely uninhabited

1. The bill was signed by the Governor on July 17, 1979.

2. The name of West Smithfield Manor was changed to Pleasant Grove Highlands after its petition for annexation was filed. There were approximately 80 black families in the Highlands. *See* Defendant's Statement of Genuine Issues at 3.

and the Glasgow Addition was practically *uninhabited*. Yet the majority opinion makes numerous references to the Western and Glasgow Additions as being *"inhabited by whites."*[3] There is not a single person, however, white or black, living in the large 430 acre area covered by the Western Addition, and the much smaller Glasgow Addition includes members of one family only—the Glasgows. But this mischaracterization of the facts is necessary to support the fallacious theory of my colleagues that these areas should be treated as being inhabited *solely* by white citizens because Pleasant Grove, through the years, has managed to remain all white in part by following racially discriminatory practices. The majority therefore treats the annexation of vacant land exactly as if that land were already inhabited exclusively by whites. The majority thus treats its speculation as to the future development of the Western Addition to Pleasant Grove as a fact upon which a Voting Rights Act violation can be predicated.[4]

The majority is apparently persuaded by the government's assertion that the uninhabited areas should be treated as "white" areas. The weakness in the government's evidence, however, is apparent in its response to the plaintiff's first set of interrogatories, which indicates that the government refused to approve the annexation of the Western Addition and Glasgow areas because "said land was annexed for the express purpose of residential construction, *which houses will be occupied by white persons."* As indicated above, the italicized statement is completely speculative. The government points to the fact that the other annexations have generally developed with completely white populations. However, there is absolutely no way to guarantee, much less safely predict, that newly annexed areas will be occupied exclusively by white citizens or by black citizens. Even if the annexed areas become generally white, this will not necessary be the result of illegal discrimination. The majority, however, writes as if the City has an affirmative duty to pursue an annexation policy which will result in a higher proportion of voting blacks within the City. But the existence of such a duty has been explicitly denied by the Supreme Court in its interpretation of the Voting Rights Act. *See* discussion *infra*. Whenever land in the Western Addition is available for purchase, there is always the possibility that it will be bought by a black citizen.

My colleagues further state:

The Court [meaning the majority opinion on the motion] further decided that a political entity may not annex *adjacent white areas* while applying a wholly different standard to adjacent black areas and failing to annex them based upon that discriminatory standard. 568 F.Supp. at 1460.

Maj.Op. at 783. They contend that this statement from the prior majority decision states the law of the case. But it is *not*

---

**3.** In footnote 5 my colleagues state "while the Western Addition is undeveloped, its location and the city's plans indicate that it is *likely* to be developed for use by white persons only" (emphasis added). Nevertheless, my colleagues continue to state that the annexations are *white areas*. They reason illogically that if it is *likely* to be developed it *must* be treated as a white area. The majority assumes that the City will lawlessly participate in the segregated development of the Western Addition. While I recognize that the City has acted previously in a racially discriminatory fashion, I am unwilling to fully join the majority's assumption as to the City's future conduct. Moreover, if the City does discriminate on the basis of race or color in developing the Western Addition, federal redress would be available by an action under the Fourteenth Amendment or the more appropri-

ate Fair Housing Act, 42 U.S.C. § 3601 *et seq.* (1982). However, since the majority's fears are based on historical practices, I would issue an injunction under the Voting Rights Act. *See* discussion *infra*.

**4.** It must be kept in mind that the City's refusal to approve the annexation requests of the Smithfield, Five Acre Road, and Dolomite areas is not at issue in this action. On the authority of *Beer v. United States*, 425 U.S. 130, 96 S.Ct. 1357, 47 L.Ed.2d 629 (1976), it is clear that section 5 of the Voting Rights Act does not apply to the refusal to alter electoral procedures. Thus the City's failure to annex these areas is not properly before the court, although the majority seems unaware of this point. *See* Maj. Op. at 784.

the law of the case because it is based on facts that are *not* the facts of this case. The true facts here bring into play *uninhabited* and black inhabited areas—not white and black *inhabited* areas.[5]

My colleagues spell out numerous racially discriminatory practices by Pleasant Grove over the last 45 years. These practices include racial discrimination in zoning and hiring, racial steering in the housing market, school segregation and discriminatory annexation. While some are overstated and recognize no adverse or ameliorative explanation, the allegations of substantial historical racial discrimination are generally accurate. The majority has some reason to conclude that Pleasant Grove has successfully excluded black citizens from becoming residents and from practically *all* facets of its local life. The court, relying upon *Rogers v. Lodge,* 458 U.S. 613, 624–26, 102 S.Ct. 3272, 3279–80, 73 L.Ed.2d 1012 (1982) (discrimination in at-large voting), and *Busbee v. Smith,* 549 F.Supp. 494, 516–17 (D.D.C.1982), *aff'd,* 459 U.S. 1166, 103 S.Ct. 809, 74 L.Ed.2d 1010 (1983) (reapportionment of congressional districts splitting composite black area to minimize possibility of electing a black candidate), how-

ever, goes further and concludes that such historic discrimination in other respects validly evidences the discriminatory *purpose* required under the Voting Rights Act to justify denying preclearance of annexations. This last step is unwarranted and misconstrues the law of discriminatory purpose.

The discriminatory *"purpose"* which is required by decisions in the voting rights cases is a purpose *related to voting.*[6] No such relation exists here. *Rogers,* relied on by the majority, involved the maintenance of an at-large system of electing county commissioners that was neutral in origin, but which was being maintained for discriminatory purposes. *Rogers,* 458 U.S. at 626–27, 102 S.Ct. at 3280–81. It did not in any way involve the speculation that some act, such as annexation, would eventually result in the denial or abridgement of minority voting strength. *Busbee,* on which the majority also relies, emphasized that discriminatory purpose alone would taint a *voting change.* But *Busbee* involved an actual voting change—the reapportionment of congressional districts involving actual voters. In this case, since the land is vacant, there is no voting change. If there is

---

5. The 40 acre Glasgow Addition differs from the Western Addition insofar as it was inhabited by 14 white citizens at the time of annexation, in contrast to the 430 acres of completely vacant land in the Western Addition. However, the fact remains that the Glasgow Addition is a forty-acre parcel populated by members of a single extended family, albeit a white family. In addition, the record shows that annexation of the Glasgow Addition was approved as a personal favor to the Glasgow family, a reason not foreign to the action of city councils in small towns. While the majority may look askance at municipal decisions based on such factors, I am unprepared to say that the Glasgow decision was made for the "purpose or will have the effect of denying or abridging the right to vote on account of race or color." 42 U.S.C. § 1973c (1982). Such effect is in no way demonstrated. Even if the presence of the Glasgow family were to cause a different result, the annexation of the Western Addition should still be approved. Since the Western Addition poses the primary problem here, this opinion is generally directed at the issue raised by its annexation.

6. The statute itself indicates that a discriminatory purpose must be related in some way to voting: "Whenever a [jurisdiction covered by

the Voting Rights Act] shall enact or seek to administer any voting qualification or prerequisite to voting ... such [jurisdiction] may institute an action ... for a declaratory judgment that such qualification [etc.] does not have the purpose ... of denying or abridging the right to vote on account of race or color...." 42 U.S.C. § 1973c (1982). The Supreme Court's decision in *City of Richmond v. United States,* 422 U.S. 358, 95 S.Ct. 2296, 45 L.Ed.2d 245 (1975), which held that annexation decisions may in some instances be subject to review under the preclearance procedures of section 5, is not to the contrary. In *Richmond* the proposed annexation had a direct and substantial bearing on the electoral position of the city's black voters, whereas the proposed annexation in this case will not affect the position of minority voters, either by dilution or exclusion. To include all annexation decisions within the Voting Rights Act would not only hamper municipal decisionmaking, but would detract from the Act's central purpose of assuring that minority voters are free to exercise their constitutionally protected suffrage rights.

no concrete voting change at issue, there can be no *"voting change"* taken with a purpose of discriminating, *see Busbee*, 549 F.Supp. at 516 (emphasis added), and thus no violation of the Voting Rights Act, even one based on "purpose" alone.

In its denial of the City's motion for summary judgment, the majority virtually conceded that because of the peculiar facts of Pleasant Grove—the complete absence of blacks in the City and the annexed areas—the annexations could not conceivably have any discriminatory *effect. See City of Pleasant Grove v. United States*, 568 F.Supp. 1455, 1458 (D.D.C.1983). It defies all reason and common sense to attribute to a governmental entity the purpose to achieve something that cannot conceivably be achieved, particularly when it is so obviously impossible that the voting rights of any black citizen could be adversely affected. Under the majority's approach, the statutory concept of "purpose" is stretched entirely out of proportion, to the point of becoming a mere legal fiction: where a municipality had a history of racial discrimination, the majority seems to say that "purpose" to impair the voting rights of blacks can be *presumed* by an annexation of completely vacant land.

In my view the plaintiffs have demonstrated that the annexations do not "have the purpose and will not have the effect of denying or abridging *the right to vote* on account of race or color...." Section 5 *supra* (emphasis added). Annexations pose problems slightly different than the ordinary Voting Rights Act case. *See Perkins v. Matthews*, 400 U.S. 379, 91 S.Ct. 431, 27 L.Ed.2d 476 (1971); *City of Petersburg v. United States*, 354 F.Supp. 1021 (D.D.C.1972), *aff'd*, 410 U.S. 962, 93 S.Ct. 1441, 35 L.Ed.2d 698 (1973); *City of Richmond v. United States*, 422 U.S. 358, 95 S.Ct. 2296, 45 L.Ed.2d 245 (1975).

In *City of Petersburg* we were confronted with a substantial dilution of the voting strength of black citizens. Petersburg covered an eight square mile area with a population of 36, 103, and it annexed fourteen square miles of adjacent area containing 7,323 persons. Before the annexation Petersburg was 55% black and 45% white; after the annexation Petersburg was 54% white and 46% black. This represented an almost complete reversal in racial proportion—a substantial dilution. We approved the annexation on the grounds that it was conducive to the orderly development of Petersburg but, in order to ameliorate the substantial dilution of the black vote, we *imposed the condition* that Petersburg switch from an at-large to a ward system of electing the members of the council. The Supreme Court affirmed, 410 U.S. 962, and in *City of Richmond* stated that *"Petersburg* was correctly decided." 422 U.S. at 370.

*City of Richmond* was followed by *Beer v. United States*, 425 U.S. 130, 96 S.Ct. 1357, 47 L.Ed.2d 629 (1976), which held that "the purpose of § 5 has always been to ensure that no voting-procedure *changes* would be made that would lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise." 425 U.S. at 141, 96 S.Ct. at 1364. *City of Lockhart v. United States*, 460 U.S. 125, 103 S.Ct. 998, 74 L.Ed.2d 863 (1983), another Voting Rights Act case from a three-judge court of this district, followed. In *Lockhart*, Chief Judge Spottswood Robinson stated in dissent that "the voting strength of Lockhart's minorities, whether or not enhanced, [has not been] diminished one whit." 559 F.Supp. 581, 595 (D.D.C.1981). In siding with the dissent, the Supreme Court found that "[t]he District Court erred in finding that the continued use of numbered posts has a retrogressive effect on minority voting strength." 460 U.S. at 135, 103 S.Ct. at 1004. The Court also stated that while "there may have been no improvement in [the] voting strength [of minorities] there has been *no retrogression* either," and therefore "[a]pplying the standards of *Beer v. United States"* the Court ruled that "the election changes introduced by the 1973 Lockhart City Charter will not have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group." *Id.* at

135–36, 103 S.Ct. at 1004. The result of the annexations here is practically identical—the annexation of the Western Addition and the Glasgow Addition will not deny or abridge the *right* to vote on account of race or color of a single individual.

As stated above, however, the majority contends that the annexations in this case constitute a violation of the Voting Rights Act because Pleasant Grove cannot escape its history of numerous acts of racial discrimination extending all the way back to 1940 and beyond. In my view this conclusion is based on highly speculative reasoning and assumptions. Moreover, in my opinion, there is no violation of the *Voting* Rights Act here, since there is no showing of any *retrogession* in any respect in the Voting Rights of any minority by the speculative conclusion that such discrimination is "likely" to arise in the future. My colleagues are indulging in an unreasonable expansion of the Voting Rights Act. This is the first case I can find and none have been called to our attention where objection is raised to annexation of an uninhabited area by a municipality with no black voters. I would therefore approve the annexations, and to alleviate the speculative fears stemming from the historic racial discrimination, I would, as a condition to approving the annexations, enjoin the City of Pleasant Grove from taking any action affecting the Western and Glasgow Additions that would constitute any form of racial discrimination.[7]

It may be in the years ahead that the development of the Western Addition will turn out like the rest of Pleasant Grove and become exclusively or substantially occupied by white citizens. This could be accomplished by completely normal and legal activity. However, if black citizens want to move into the area, they have a constitutionally protected right to do so. If Pleasant Grove takes any discriminatory action based on race or color, it could be redressed under the injunction.

7. I also rely on my opinion in *City of Pleasant Grove v. United States,* 568 F.Supp. at 1460–64

### III.

Not only is the government's contention that the Western Addition assuredly will develop all white occupancy essentially speculative, but both annexations may also be justified in terms of the City's fiscal structure. The City points out that *uninhabited* land is open to development, and once developed will create a new market for municipal water and gas, thus producing substantial municipal income. On the other hand, the areas that the majority faults Pleasant Grove for not annexing are substantially *inhabited,* and are thus void prospects for producing potential municipal income from its most beneficial source. Revenue from taxes would merely be a standoff for services rendered.

The majority's decision focuses on, *inter alia,* the economics of the various annexation decisions. The government pointed out that the City's decisions not to annex petitioners and Dolomite (another area inhabited by black citizens) were not preceded by any comprehensive study, and argues that some of the figures subsequently produced by City officials distort the true comparative picture of costs and benefits to Pleasant Grove of annexing the black citizens' areas, as opposed to the Western Addition. The majority largely follows the government in this approach. The City does not contest the absence of any formal economic analysis prior to its annexation decisions, and now concedes that some of the cost figures (those for the fire department and for streets and sanitation) were inaccurate. Plaintiff's Reply Brief at 10.

The record, however, is in truth largely inconclusive on the comparative per capita costs to Pleasant Grove of providing vital services to the respective areas in question. Only as to police services was there any indication that petitioners might be more expensive, and the crime data was incomplete. Nonetheless, there is one very good fiscal reason that Pleasant Grove should

(1983).

prefer annexation of the Western Addition to that of the petitioners—and indeed prefer annexing any undeveloped area to most inhabited developed neighborhoods. The following statement, based on deposition and exhibits, sums up the City's financial situation:

*The City of Pleasant Grove derives most of its revenue, not from taxes or the other usual impositions of city governments, but from the sale of water and natural gas.* The City, through its Utilities Board, is the distributor of water and natural gas *for the area of Alabama which surrounds it.* [Mays Affidavit, para. 3]. In the year ending September 30, 1980, Pleasant Grove's "Total revenues and transfers" were $1,382,193. [Exhibit C to Attachment 3 to the Mays Affidavit]. "Revenues" contributed only $499,341 of this amount. $882,852 came from "Transfers from other funds." Of that $882,852, $871,852 was transferred from the Utilities Board of the City of Pleasant Grove.... *"Revenues" provided only 28% of Pleasant Grove's expenditures* in the fiscal year ending September 30, 1980.

[H]owever, not all items under "Revenues" could be expected to increase in approximate proportion to population if Pleasant Grove were to annex [petitioners].... [T]he items of *revenue which would grow proportionately with annexation total only $255,404, which is only 14% of "Total expenditures and transfers"* for 1980. [Mays Affidavit, para. 4].

Plaintiff's Statement of Facts in Support of Motion for Summary Judgment at 10–11 (emphasis added). According to the deposition of the City's clerk and treasurer, Sarah Mays, the updated figure for revenues that should increase proportionately to population is 23%. Mays Deposition at 12. The government nowhere contests the accuracy of these figures as a basic outline of the municipality's finances.

The City's heavy reliance on *profits* from the distribution of water and natural gas to the surrounding vicinity provides a powerful reason alone for aversion to annexation of already populated areas. Absent a complete restructuring of the fiscal system, *revenues (taxes) from an already developed area could not possibly even approach the costs of services.* In effect, the City would be subsidizing such an inhabited area—sharing the profit generated from water and gas distribution sold to new markets in newly annexed areas to pay for the services required in the already developed areas. Undeveloped areas, by contrast, may be expected to pay for the services they require by generating development fees, rather than tapping into the profits the City gains by selling gas and water. The exact levels of costs for services are entirely immaterial in this respect. This ability of Pleasant Grove to raise net revenue from the sale of water and gas alone provides a complete and presumably legitimate explanation for the failure of Pleasant Grove to annex the substantially developed areas of petitioners and Dolomite, and for preferring to annex the completely undeveloped Western Addition and the practically undeveloped Glasgow addition.

The only areas which could sensibly be annexed are those which remain undeveloped—*i.e.,* still capable of yielding substantial *development fees* (for building permits). According to the affidavit of Mays and exhibits thereto, the City also relies to some significant degree on development fees as a source of revenue. Mays Affidavit, ¶ 5. In good years, the City's receipts of development fees equal or exceed the total of revenues derived from such sources as sales, income, and property taxes. This suggests that the majority is incorrect in suggesting that if the sales, income, and property taxes of the petitioners' areas were taken into account, it would be fiscally desirable to annex them. *See* Maj.Op. at 786. If the development of the Western Addition would produce a major potential source of such development fees, the City is thoroughly justified in desiring to annex the area which has that potential. The financial potential of the 1979 annexation is clearly distinguishable from the other situations, and constitutes a persuasive

nonracial basis for the City's decision to prefer annexation of the Western Addition.

The majority attempts to undercut the figures submitted by Pleasant Grove, pointing out that no *prior* studies were made. That, however, does not sully the *present* figures. Moreover, Pleasant Grove is a small town of slightly over 7,000 persons, and councilmen in such municipalities are traditionally close to the costs and benefits of a small municipal operation. They may not need the extensive studies of larger cities nor should this court require them. It is just plain common sense that Pleasant Grove would profit more from developing areas where they will have a new market for a *profitable* activity than from annexing areas that are already serviced.

The existence of these persuasive, nonracial purposes for the annexations of the Western and Glasgow Additions negates the inference based solely on speculative assumptions from historic discrimination policies. This is especially true in this case, where the finding of a racial purpose by the majority is little more than a presumption of discriminatory purpose inferred from the City's history of racial discrimination. Historic racial discrimination can be a strong indication of discriminatory purpose, *City of Richmond v. United States,* 422 U.S. 358, 362, 95 S.Ct. 2296, 2299, 45 L.Ed.2d 245 (1975), in cases where voting rights of actual resident citizens are involved, but this annexation of *vacant* land is not connected to voting and does not deny or abridge the right to vote on account of race or color. For these reasons, I cannot join the majority in their conclusion that the evidence proves that the annexations were arranged to advance a discriminatory purpose that is violative of the Voting Rights Act. On the contrary, the City has provided adequate fiscal reasons for its annexation of the Western and Glasgow Additions, and enjoining the municipality from any racially discriminatory action in the annexed areas will ensure that voting rights, and other civil rights, are not denied in contravention of the Constitution and statutes of the United States.