Lillie BURTON, et al, Plaintiffs,

v.

**CITY OF BELLE GLADE,**
**et al, Defendants.**

No. 95–8356–Civil.

United States District Court,
S.D. Florida.

May 20, 1997.

Neil Bradley, Cristina Correia, ACLU Foundation, Atlanta, GA, Robert McDuff, Jackson, MS, for Plaintiffs.

Gerald Richman, Gary Betensky, Richman, Greer Weil Brumbaugh Mirabito & Christensen, West Palm Beach, FL, for City of Belle Glade.

Margaret L. Cooper, Jones Foster Johnston & Stubbs, West Palm Beach, FL, for Belle Glade Housing Authority.

### ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

RYSKAMP, District Judge.

THIS CAUSE came before the Court upon plaintiffs' Motion for Summary Judgment [DE 139], filed April 8, 1997, and defendants' Motion for Summary Judgment [DE 142], filed April 7, 1997. The parties have fully briefed these cross-motions for summary judgment, and have argued their cases in a hearing held May 13, 1997. The Court must now decide whether a trial should be held to determine whether the City of Belle Glade must annex a housing project known as the Okeechobee Center. For the reasons explained below, the Court concludes that no trial need be held, and that defendants should prevail as a matter of law.

### I. BACKGROUND

The City of Belle Glade sits on the western side of Palm Beach County, near the southern boundary of Florida's agricultural heartland. Although long incorporated, Belle Glade received its present charter as a municipal corporation by an act of the Florida legislature in 1961. 1961 Fla.Laws ch. 61–1880. At that time, the United States census showed the population of Belle Glade to be

approximately 65% non-white and 35% white.[1] Plaintiff's Ex. 15. By 1993, a special census revealed that the black proportion of the population had shrunk to 54.8%, and that whites now composed 39.7% and Hispanics 25.3% of the general population. Plaintiff's Ex. 38. Thus, while blacks remained in the majority, their proportion of the voting age[2] and general populations had shrunk. Plaintiffs blame this shrinkage on Belle Glades's allegedly discriminatory annexation policies, and, in particular, on the City's failure to annex the housing project where four of the plaintiffs reside.

In the 1930s, the Federal Government funded and built two housing projects in the vicinity of Belle Glade, but outside city limits. The Federal Government deeded the projects to the City of Belle Glade in the 1940s. "Jim Crow" still ruled in those years, and the projects were segregated by race. The white project, known as the Osceola Center, stood on a parcel of land at the City's northwest corner. The black project, known as the Okeechobee Center Farmers' Home Administration Project ("Okeechobee Center"), stood on a 160 acre parcel to the southwest of Belle Glade, non-contiguous to any part of the City. The projects remained segregated by race until the Secretary of Agriculture brought suit to enforce Title VI of the Civil Rights Act of 1964 in March of 1975. *Mae Golden Acres Tenants' Assoc. v. Butz*, Case No. 75–1161–CIV–JE (S.D.Fla.). This brought the *de jure* segregation of the projects to an end. With time, the Osceola Center came to reflect Belle Glade's overall demographics more closely. As of May, 1994, its population was 46% black, 50% Hispanic, and 4% white. Plaintiff's Ex. 13. The tenant population of Okeechobee Center, however, remains 92% black, with Hispanics making up most of the remaining 8%.[3] *Id.*

In 1947, the City of Belle Glade created the Belle Glade Housing Authority ("BGHA") to address the "shortage of safe or

---

1. The 1960 census did not distinguish between the various non-white groups, but it is probably safe to assume that the non-white category consisted in large part of African–Americans.

2. The 1990 Census Data revealed the following voting age population break-downs: white: 34%;

black: 57%; Hispanic: 21%. Defendants' Reply Memo. Ex. 1.

3. The Okeechobee Center houses approximately 1,424 persons in 428 units.

sanitary dwelling accommodations in the City of Belle Glade available to persons of low income at rentals they can afford." Resolution No. 623, City of Belle Glade, July 3, 1947, attached as Plaintiff's Ex. 3. The BGHA owns and operates both the Osceola and Okeechobee Centers. The BGHA's board consists of seven members whom Belle Glade's mayor nominates and the City Commission appoints. Federal funds, channeled through the Department of Agriculture, help to finance the BGHA's work.

In 1961, upon petition of the BGHA, the City of Belle Glade annexed the Osceola Center. At the time of annexation, the Center remained a whites-only facility. The parties dispute the City's motivations in annexing the Osceola Center and in not annexing the Okeechobee Center at the same time. Defendants claim that Belle Glade felt it needed to provide police protection to the Osceola Center due to recent threats against the project's manager, whereas the City had no similar motive to annex the Okeechobee Center. Ex. 1 to Defendant's Response to Plaintiff's Motion for Summary Judgment. Plaintiffs claim a more sinister motive—that this was racial politics pure and simple.

The tenants of Okeechobee Center first petitioned the Belle Glade City Commission to annex the Okeechobee Center in February of 1973. The City Commission responded that it would only consider such annexation if the BGHA requested it. The tenants then presented their request to the BGHA, which denied it in October of 1973.

The next year, changes in Florida law added further complications to the annexation issue. In October of 1974, the Florida legislature amended its laws relating to municipal annexations to forbid annexation of properties not contiguous to the city's present boundaries. Fla.Laws ch.74–190, codified at Fla.Stat. § 171.022. The parties dispute whether Okeechobee Center is contiguous to the City of Belle Glade within the meaning of the statute. State Road No. 80, which the City annexed in 1965, forms the northern boundary of the Okeechobee Center, running parallel to the project for about half a mile. Plaintiffs claim that this road makes the Okeechobee Center contiguous to the City, while defendants argue that it does not.

In 1980, an unincorporated tenants association brought suit against the BGHA and the City, seeking, inter alia, annexation of Okeechobee Center. Okeechobee Center Cries for Help v. Belle Glade Housing Authority & City of Belle Glade, Case No. 80–8220–CIV–JAG (S.D.Fla.). At the same time, four black citizens of Belle Glade filed a lawsuit seeking virtually identical relief. Jackson v. City of Belle Glade, Case No. 80–8156–CIV–JAG (S.D.Fla.). The parties settled both suits, which the court dismissed with prejudice in March of 1984. As part of the settlement agreement in Okeechobee Center Cries for Help, the City agreed to the creation of an "Annexation Committee" that would be created to investigate and make a recommendation as to whether Belle Glade should annex the Okeechobee Center. The Committee would consist of one member of the Okeechobee Center Tenant's Association, one black resident of the City of Belle Glade as recommended by the Panhellenic Council, and three additional members, at least one of whom had to be a member of a minority group, to be appointed by the Belle Glade City Commission. Pursuant to the agreement, the Committee met, investigated the possibilities, and issued a recommendation against annexation. Defendant's Ex. 2. The Committee's report specifically noted that the Okeechobee Center was not contiguous to the City, and that it therefore could not be annexed according to the relevant Florida statute.

Unsatisfied with the Committee's recommendation, Albert Patterson, a resident of Okeechobee Center, wrote Belle Glade's City Attorney in May of 1995, requesting that the City annex the Okeechobee Center. The City responded that the contiguity requirement of Florida law prevented such an annexation. On June 12, 1995, four tenants of the Okeechobee Center and four black residents of the City of Belle Glade initiated this case by filing a Complaint for Injunctive and Declaratory relief against the City of Belle Glade, its City Council, mayor, and council members, the Palm Beach County Supervisor of Elections, and the BGHA and its

officers and members. The plaintiffs alleged that the City refused to annex the Okeechobee center for racial reason, in violation of the First, Thirteenth, Fourteenth, and Fifteenth Amendments of the Constitution, Section 2 of the Voting Rights Act of 1965, 42 U.S.C. § 1973, and Title VI of the Civil Rights Act of 1964 and its implementing regulations, 42 U.S.C. § 2000d and 7 C.F.R. § 15.3. By Order dated February 7, 1996, the Court, *inter alia,* dismissed the plaintiffs' claims to the extent that they relied on the First and Thirteenth Amendments, expressed its view that the remedy of forced annexation was not available under the Section 2 of the Voting Rights Act, and required the plaintiffs to refile their constitutional claims under 42 U.S.C. § 1983. Plaintiffs subsequently filed an Amended Complaint.

Both sides have now moved for summary judgment, asking the Court to determine that they should prevail as a matter of law. Plaintiffs argue that the uncontroverted record evidence establishes a deliberate racial motive by Belle Glade to refuse to annex the Okeechobee Center. Defendants argue that summary judgment must be entered on their behalf, because the Court simply cannot grant plaintiffs the relief they request.

## II. *LEGAL STANDARD ON A MOTION FOR SUMMARY JUDGMENT*

Federal Rule of Civil Procedure 56(c) sets forth the standard governing summary judgment. In its most basic form, summary judgment is appropriate where there is no genuine issue of material fact in dispute and the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986) ("the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.") (emphasis in original).

The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). Once the moving party has met its burden, the party opposing summary judgment may not simply rely on the pleadings or mere denials of the allegations. Rather, the opposing party must adduce some evidence showing that material facts are in issue. *Anderson,* 477 U.S. at 256, 106 S.Ct. at 2514. "Rule 56(c) therefore requires a non-moving party to go beyond the pleadings and by [its] own affidavits or by the depositions, answers to interrogatories, and admissions on file designate specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *See also Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

The Eleventh Circuit has restated the method for allocating burdens in a summary judgment motion. Specifically, in accordance with U.S. Supreme Court precedent,

> The moving party bears the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment.

*Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir.1991).

## III. *DISCUSSION*

As a general matter, the Court is extremely skeptical that it holds the power to order the annexation of the Okeechobee Center, no matter how egregious the racial climate in Belle Glade. Certainly, the federal courts sometimes redraw political lines, whether those of electoral districts or municipalities. *See, e.g., Baker v. Carr,* 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962) (holding that federal courts may order reapportionment of state electoral districts); *Gomillion v. Lightfoot,* 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960) (prohibiting act of Alabama legislature to redefine city boundaries in such a way as to cut out primarily black neighborhoods). It is one thing, however, to say that a political unit must structure its voting

blocks to secure fair voting, or annex (or de-annex) new areas in a racially neutral manner, and quite another thing to say that a political unit must reach outside of its boundaries and grant municipal citizenship to outsiders. Plaintiffs cite no case in which a federal court has ordered a municipality to annex property outside of its boundaries, and the Court would be extraordinarily reluctant to establish such a precedent.

Fortunately, this case does not require the Court to resolve the broad question of whether it even could order Belle Glade to annex the Okeechobee Center pursuant to its Article III powers. For a number of much narrower reasons, the Court concludes that defendants should prevail on summary judgment. Although plaintiff's theories largely overlap, the Court will address the statutory and constitutional theories separately.

## A. The § 1983 Claims

■ Plaintiffs claim that Belle Glade's refusal to annex the Okeechobee Center denied them the equal protection of the laws in violation of the Fourteenth Amendment, and the right to vote (on account of race) in violation of the Fifteenth Amendment. Although plaintiffs tell their story as a seamless web of events stretching from the creation of the Okeechobee Center in the 1930s until the present, many of the occurrences they recount happened a long time ago. Actions brought pursuant to 42 U.S.C. § 1983 are governed by the relevant state's general personal injury tort statute of limitations. *Wilson v. Garcia,* 471 U.S. 261, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985). Section 1983 cases arising in Florida must be brought within four years of the allegedly unconstitutional or otherwise illegal act. *Baker v. Gulf & Western Indus., Inc.,* 850 F.2d 1480, 1482 (11th Cir.1988). Accordingly, plaintiffs may not prevail on their § 1983 claims by pointing to Belle Glade's refusals to annex in the 1960s, '70s, or '80s. They may rely only on the City's denial of Albert Patterson's request in 1995.

Untroubled by this obstacle, plaintiff nonetheless insist that the City's denial of Mr. Patterson's request was motivated by racial considerations. The Court finds no record evidence to support this allegation. At most, plaintiffs point to the history of the Osceola and Okeechobee projects, founded, as they were, in an era of less egalitarian social attitudes toward race. The BGHA undeniably segregated the projects by race for a long time, and it may well be that race played a part in the City's decision not to annex the Okeechobee Center in 1961 and 1973. But attitudes toward race in the 1960s and '70s will not, standing alone, move the plaintiffs' case past summary judgment when the issue is the City's motive in refusing to annex in 1995. If the issue were solely whether plaintiffs had created a genuine issue of material fact as to the City's motives in refusing to annex within the period of the statute of limitations, the Court would be inclined to grant summary judgment in favor of defendants.

An additional, structural impediment to plaintiffs' claims provides even greater support for defendants' position. Defendants argue that Florida's statute on annexations in effect since 1974 prohibits Belle Glade to annex the Okeechobee Center, because the project is not contiguous to the City. Plaintiffs make essentially three responses to this claim: (a) not true, (b) so what?, and (c) be consistent! In their first argument, plaintiffs dispute defendant's interpretations of the statute. In their second argument, they suggest that the Court would have the power to require annexation even if it were forbidden by state law. In their final argument, they allege that Belle Glade has annexed noncontiguous parcels since 1974, and that it should therefore be estopped from raising the statute as a defense. The Court will consider each of these contentions in turn.

### 1. The Contiguity and Compactness Requirements of Section 171

■ Since 1974, it has been the law in Florida that municipalities may only "annex contiguous, compact, [and] incorporated territory." Fla.Stat. § 171.0413; *see also, City of Tampa v. Hillsborough County,* 504 So.2d 10 (Fla. 2d DCA 1986) (affirming Circuit Court's invalidation of city's annexation of noncontiguous area); *c.f. City of Sanford v. Seminole County,* 538 So.2d 113 (Fla. 5th

DCA 1989) (reversing Circuit Court's invalidation of proposed annexation because unincorporated parcels *were* contiguous). The following lengthy definition of "contiguous" bears repetition in whole:

"Contiguous" means that a substantial part of a boundary of the territory sought to be annexed by a municipality is coterminous with a part of the boundary of the municipality. The separation of the territory sought to be annexed from the annexing municipality by a publicly owned county park, a right-of-way for a highway, road, railroad, canal, or utility or a body of water, watercourse, or other minor geographical division of a similar nature, running parallel with and between the territory sought to be annexed and the annexing municipality, shall not prevent annexation under this act, provided the presence of such a division does not, as a practical matter, prevent the territory sought to be annexed and the annexing municipality from becoming a unified whole with respect to municipal services or prevent their inhabitants from fully associating and trading with each other, socially and economically. However, nothing herein shall be construed to allow local rights-of-way, utility easements, railroad rights-of-way, or like entities to be annexed in a corridor fashion to gain contiguity; and when any provision or provisions of special law or laws prohibit the annexation of territory that is separated from the annexing municipality by a body of water or watercourse, then that law shall prevent annexation under this act.

Fla.Stat. § 171.031(11). The statute also defines compactness:

"Compactness" means concentration of a piece of property in a single area and precludes any action which would create enclaves, pockets, or finger areas in serpentine patterns. Any annexation proceeding in any county in the state shall be designed in such a manner as to ensure that the area will be reasonably compact.

Fla.Stat. § 171.031(12).

The parties do not dispute that the Okeechobee Center does not touch any property

within the limits of Belle Glade except for State Road 80, which runs southwards for about a mile from the southwest corner of the city's main body, then cuts due east for about another mile, running parallel to the northern boundary of the Okeechobee Center for about half a mile in its eastward course, and then curves back to the north to rejoin Belle Glade.[4] They disagree, however, whether the mere fact that the Okeechobee Center touches a road within city limits makes the center contiguous to the City. Plaintiffs offer a simple syllogism: State Road 80 is part of the City, the Okeechobee Center is contiguous to State Road 80, therefore the Okeechobee Center is contiguous to the City. On the other hand, defendants point to the following prohibition in the statute: "[N]othing herein shall be construed to allow local rights-of-way, utility easements, railroad rights-of-way, or like entities to be annexed in a corridor fashion to gain contiguity...." Fla.Stat. § 171.031(11). They also allude to the compactness requirement, and the prohibition against the creation of enclaves. Plaintiffs respond that the statute only prohibits annexing roads to gain contiguity, and that it allows a road previously annexed to be used as a basis for annexing property contiguous to such a road.

As a matter of statutory construction, the Court sees a substantial difficulty with plaintiffs' argument. In their view, the propriety of using a road annexation to gain contiguity depends on whether the road was annexed previous to or contemporaneous with the attempted annexation of the unincorporated area in question. But if this were the case, a city could easily defeat the legislature's designs by annexing a road, waiting a few months, and then annexing properties contiguous to the road. Of course, under the plaintiff's reading of the statute, a plaintiff could then argue to a court that the previous annexation of the road had been for the purpose of gaining contiguity with the unincorporated area. Now the court would have to

---

4. This is also not a case in which a road merely separates the boundaries of the municipality and the proposed area of annexation, which otherwise run parallel. The statute specifically allows annexation in those situations.

hear evidence on the city's subjective intent in previously annexing the road. Was it really in order to gain contiguity, or did the city have a permissible motive?

In actual operation, the statute, as interpreted by plaintiffs, would make the contiguity inquiry turn on the city's subjective intent in annexing the roadway. But surely the Florida Legislature intended no such thing. Reading Section 171 as a whole, it is clear that the Legislature was primarily concerned with tightening up municipal boundaries, ensuring compactness, and eliminating bizarre shaped borders and inefficient enclaves. Shape and function, not intent, were its interests. If the prohibition on corridor annexations meant nothing more than that a city must first annex the roadway and then annex the outlying area, defeating the Legislature's intent would be ludicrously easy.

Fortunately, the Court need not decide the statute's meaning in a vacuum of authority. In 1977, Florida's Attorney General issued an opinion precisely on point. Responding to the question: "May a parcel of land be voluntarily annexed into a city if such parcel is contiguous with the city only by virtue of a single side of the parcel meeting one side of a highway previously annexed into the city?," the Attorney General answered "no." 1977 Fla.Op.Atty.Gen. 35. Although noting that Florida's courts had not yet passed upon the question (and, apparently, they still haven't), the Attorney General stated that in other jurisdictions "the great weight of authority is that contiguity existing only through a narrow 'corridor,' such as a highway, running from a city to a tract of land some distance from the city is not sufficient to justify the annexation of such tract of 'contiguous' or 'adjacent' territory," and cited a number of cases to this effect. *Id.* Noting that in Florida the power of annexation "must be exercised in strict accordance with the statute conferring it," the Attorney General opined that the Florida Courts would adopt the majority position. *Id., citing Town of Mango-*

*nia Park v. Homan,* 118 So.2d 585, 588 (Fla. 2d DCA 1960).

A more recent opinion of the Attorney General further confirms this position. Asked whether the annexation statute would permit a city "to voluntarily annex a parcel of property, one side of which is contiguous to a previously annexed corridor, but which is otherwise surrounded by unincorporated land," the Attorney General again answered no. 1985 Fla.Op.Atty.Gen. 163. Although concluding that such an annexation would not necessarily violate the corridor annexation prohibition of Section 171.031(11), the Attorney General nonetheless found that it would violate the statute's compactness requirement. Plaintiffs characterize this opinion as supporting their view that the contiguity requirement of Section 171.031(11) does not prevent the annexation of the Okeechobee center, and, in a narrow way, the opinion does indeed support their interpretation of that section of the statute. Plaintiffs, however, miss the larger point; the opinion says that such roadway annexations are nonetheless illegal under Florida law because they violate the statutory compactness requirement. Thus, the Court finds no support for plaintiffs' position in any of the Attorney General opinions cited by the parties.[5]

Attorney General opinions, of course, provide the court with persuasive, but not controlling, precedent. In this case, the Court finds the Attorney General's position to conform to the structure and purposes of the annexation statute. Accordingly, the Court will hold that the proposed annexation of the Okeechobee Center would have been illegal under Florida law since 1974.

### 2. Federal Remedies and State Statutes

■ This brings us to plaintiffs' "so what" response to defendants' citation to the annexation statute. Marshaling a long string of citations, plaintiffs argue that even if Florida law prohibits the annexation of the Okeecho-

---

**5.** The Court would note that a 1993 statutory amendment defining "enclave" would appear to mean that the Okeechobee Center, if annexed, would not be an enclave within the meaning of the statute. Fla.Laws 93–206, *codified at* Fla. Stat. § 171.031(13). But even if a roadway an-

nexation would not create an enclave, it would nonetheless violate the compactness requirement. *See* Fla.Stat. § 171.031(12) (defining enclave as *one of the things* forbidden under compactness requirement).

bee Center, the Court has the power to override the Florida statute and order annexation. As a general matter, the Court does not disagree that the Supremacy Clause of Article VI empowers a federal court to override a state statute that stands in the way of the federal court's need to remedy a constitutional wrong. However, this principle has no application in this case, where every alleged wrong that was actionable in 1995 occurred at a time when the decision that plaintiffs sought was prohibited by the state annexation statute.

 Plaintiffs' arguments regarding the preemptive power of federal remedies have no force until they first establish that the Court has before it a wrong to remedy. As the Court sees it, the fate of plaintiffs' § 1983 claims comes down to a matter of causation. It is well established that a plaintiff cannot recover for violation of his constitutional rights without proving that a violation of the Constitution caused his injury. *See, e.g., Mt. Healthy City School Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 286, 97 S.Ct. 568, 575, 50 L.Ed.2d 471 (1977) ("[T]his Court has found it necessary to formulate a test of causation which distinguishes between a result caused by a constitutional violation and one not so caused."). In this case, plaintiffs have argued that the wrong of racial discrimination caused their injury of lack of annexation. However, the Court has already concluded that during the relevant period of time, Florida law forbade the annexation of the Okeechobee Center. Regardless of the City Commission's attitudes toward blacks, annexation could not have occurred consistent with Florida law. Thus, Section 171, and not racial animus by the City, caused plaintiffs' "injury." [6] Plaintiffs simply cannot prove that the City would have annexed the Okeechobee Center in 1995 had it not been for its racist attitudes. Even if the City was relieved for racist reasons to find a perfectly good excuse not to annex, that perfectly good excuse, and not its racist reasons, caused the lack of annexation. Until plaintiffs make out a prima facie case of constitutional injury, the Court will not consider whether or not it should override Section 171.

### 3. Estoppel?

In a final effort to circumvent the annexation statute, plaintiffs argue that since 1974 the City has annexed other properties contiguous only to a previously annexed roadway, thus belying its innocent protestations that "the statute made me do it." Given the Court's prior ruling that the annexation of the Okeechobee Center is forbidden by Florida law, this argument takes on a peculiar shape. Following plaintiffs' reasoning, the Court would in effect have to say: "I find that you have sinned before, and I therefore sentence you to sin again." Somehow, the Court finds it hard to accept that the remedy for one violation of state law is another violation of state law.

In any event, the Court need not decide whether estoppel of the nature advanced by plaintiffs would lie against a municipality under these circumstances. Upon review of the record, the Court concludes that plaintiffs have not created a genuine issue material fact as to whether or not the City has annexed other properties contiguous only to a previously annexed roadway. Although plaintiffs make this assertion in their motion for summary judgment, they identify only three properties where this illegal annexation has allegedly taken place. Defendants' responsive memorandum, and the attached affidavit of City Attorney John Baker, explain how each of these three parcels was legally annexed. Upon review of this explanation, the Court is satisfied that plaintiffs have not identified any post–1974 annexations of property contiguous only to a previously annexed roadway. Accordingly, the Court need not consider the full implications of plaintiffs' argument.

### B. Voting Rights Act

 The Court accomplished much of the work on the Voting Rights Act claim in its previous order on defendants' motion to dismiss. Specifically, the Court held that man-

---

**6.** Actually, plaintiffs' injury is no injury at all, but, at most, *damnum absque injuria* (hurt without legal injury).

datory annexation is not an available remedy under the Act. In support of this proposition, the Court relied on *City of Pleasant Grove v. United States,* 479 U.S. 462, 470, 107 S.Ct. 794, 799, 93 L.Ed.2d 866 (1987), which held that even a racially motivated decision not to annex does not represent a change in voting rights, and therefore does not violate the Voting Rights Act.[7] Although *Pleasant Grove* arose under § 5 of the Voting Rights Act, and the present case arises under § 2,[8] the plurality reached the same conclusion in a § 2 case: "[W]e think it quite improbable to suggest that a § 2 dilution challenge could be brought to a town's existing political boundaries (in an attempt to force it to annex surrounding land) by arguing that the current boundaries dilute a racial group's voting strength in comparison to the proposed new boundaries."[9] *Holder v. Hall,* 512 U.S. 874, 884, 114 S.Ct. 2581, 2587–88, 129 L.Ed.2d 687 (1994).

Although these cases permit a court to order a city not to annex white areas, thus diluting the black minority's vote within the city, they do not permit a court to order the city to annex the black areas. Plaintiffs apparently fail to see any difference between curtailing annexation and requiring annexation. At least under the Voting Rights Act, however, there is a crucial difference. A city does not dilute minority votes by refusing for racial reasons to annex. It dilutes minority votes by annexing non-minority areas, as in *Pleasant Grove,* or de-annexing minority areas, as in *Gomillion.* Plaintiffs argue that Belle Glade diluted black votes by annexing the Osceola Center and refusing to annex the Okeechobee Center. But if the Court were

to order de-annexation of the Osceola Center, which is now 46% black and 50% Hispanic, its order would have the effect of increasing the relative strength of white votes in Belle Glade *vis a vis* black votes in Belle Glade. Surely, the plaintiffs would not welcome that result.

Plaintiffs may object that what they seek is not de-annexation of the Osceola Center, but annexation of the Okeechobee Center. They may explain that while it is true that § 2 of the Voting Rights Act only applies to vote dilution, Belle Glade committed a specific, discriminatory act of vote dilution in 1961, which continues to have effect every time the residents of Belle Glade vote today. But assume for a moment that it is now 1961, and the plaintiffs have brought suit alleging a discriminatory motive in the annexation of the Osceola Center and the simultaneous refusal to annex the Okeechobee Center. What remedy should the Court afford? On the anachronistic authority of *Pleasant Grove* and *Holder,* the Court should order Belle Glade *not to annex* the Osceola Center. It may not order Belle Glade *to annex* the Okeechobee Center. If this result would have obtained in 1961, it should surely obtain today. Plaintiffs offer no reason why the passage of thirty-six years should entitle them to relief they could not have procured when Belle Glade first refused to annex the Okeechobee Center. Obviously, de-annexing the Osceola Center today is quite out of the question (at least in this litigation). That the passage of time and sweep of demographics have altered the face of the Osceola Center does not empower the Court to order today what it could not have ordered in 1961.[10]

---

7. The Court nonetheless held that a decision not to annex, when coupled with annexations of non-minority areas, could reveal that the municipality's intentions in annexing the white areas were illegitimate. 479 U.S. at 470, 107 S.Ct. at 799.

8. The Court recently clarified the relationship between § 2 and § 5, reaffirming that these two "section[s] combat different evils and, accordingly, [] impose very different duties upon the States." *Reno v. Bossier Parish School Bd.,* — U.S. —, —, 117 S.Ct. 1491, 1497, 137 L.Ed.2d 730 (1997).

9. Only two Justices signed onto the portion of the opinion from which this quotation is drawn. However, if the authority of the proposition

comes down to a matter of head counting, the Court is quite certain that at least five votes on the Supreme Court support the "no forced annexations" position.

10. Additionally, the Court doubts whether plaintiffs have even made a prima facie showing of vote dilution within the meaning of § 2. "A plaintiff claiming vote dilution under § 2 must initially establish that: (i) '[the racial group] is sufficiently large and geographically compact to constitute a majority in a single-member district'; (ii) the group is 'politically cohesive': and (iii) 'the white majority votes sufficiently as a bloc to enable it ... usually to defeat the minority's preferred candidate." *Reno v. Bossier Parish*

■ The Court therefore concludes that the Voting Rights Act does not grant it the power to order Belle Glade to annex the Okeechobee Center. This leaves plaintiffs' request for an injunction against future discrimination in annexation · decisions. The Court does not see how such an injunction could be tailored to conform to the specificity requirements of Rule 65(d) of the Federal Rules of Civil Procedure. It is well established that the federal courts may not issue "obey the law" injunctions. *Hughey v. JMS Development Corp.*, 78 F.3d 1523, 1531 (11th Cir.), *cert. denied*, —— U.S. ——, 117 S.Ct. 482, 136 L.Ed.2d 377 (1996). Given the fact that state law precludes annexation of the Okeechobee Center, the Court at most could say: "Don't discriminate against Okeechobee Center in future annexation decisions if it ever becomes possible to annex it." The law forbids such injunctions. *See Payne v. Travenol Laboratories, Inc.*, 565 F.2d 895, 898 (5th Cir.) (order blanketly forbidding future discrimination violates Rule 65(d)), *cert. denied*, 439 U.S. 835, 99 S.Ct. 118, 58 L.Ed.2d 131 (1978). Accordingly, the Court will neither require present annexation of the Okeechobee Center, nor enter any order regarding its future.

## C. Title VI

■ Neither side chose to develop the Title VI argument at all in these motions for summary judgment. This omission appears to have arisen from the fact that the Title VI claims apply only to the BGHA, which chose to rely on the City's briefs in urging summary judgment. The City, however, had no interest in the Title VI issue, and plaintiffs chose not to pursue it independently. Nonetheless, the Court believes that Title VI warrants some brief attention as a discrete issue on summary judgment.[11]

Title VI prohibits any recipient of federal financial assistance to discriminate on the basis of race, color, or national origin in any federally funded program. 42 U.S.C. § 2000d. The Department of Agriculture's regulations further elucidate the statute's scope. 7 C.F.R. § 15.3. The fine details of the regulations, however, make no difference in this case. Unlike cases arising under the equal protection clause, a Title VI plaintiff may *perhaps* obtain injunctive or declaratory relief without proving discriminatory intent. *Guardians Ass'n v. Civil Service Comm'n*, 463 U.S. 582, 584, 103 S.Ct. 3221, 3223, 77 L.Ed.2d 866 (1983) (plurality opinion). Nonetheless, the general rule remains that "the reach of Title VI's protection extends no further than the Fourteenth Amendment." *United States v. Fordice*, 505 U.S. 717, 732 n. 7, 112 S.Ct. 2727, 2737 n. 7, 120 L.Ed.2d 575 (1992); *see also Elston v. Talladega County Bd. of Educ.*, 997 F.2d 1394, 1405–06 n. 11 (11th Cir.1993) (Noting that discussion of claims under Title VI "would duplicate exactly our equal protection analysis.").

Although in the usual case the disposition of the equal protection issues will moot any need to discuss the Title VI issues separately, *see Elston, supra*, this case may be a little different. In granting summary judgment in favor of the City on the § 1983 claims, the Court found that claims concerning pre–1974 conduct were time-barred, and claims concerning post–1974 conduct ran afoul of the Florida statute forbidding non-contiguous annexations. This ruling, however, did not necessarily preclude the possibility that the BGHA, the recipient of federal funds, violated Title VI by refusing to petition the City for annexation of the Okeechobee Center. After all, the statute prohibits annexations of noncontiguous property, not petitions to an-

*School Bd.,* —— U.S. ——, ——, 117 S.Ct. 1491, 1498; *citing Thornburg v. Gingles*, 478 U.S. 30, 50–51, 106 S.Ct. 2752, 2766–67, 92 L.Ed.2d 25 (1986); *Growe v. Emison*, 507 U.S. 25, 40, 113 S.Ct. 1075, 1084, 122 L.Ed.2d 388 (1993). Plaintiffs due not dispute that blacks constitute a majority of the voting age population within the geographic boundaries of the relevant political unit—the City of Belle Glade. Accordingly, the Court finds it difficult to understand how "the white majority (which is, in fact, a minority) votes sufficiently as a bloc to enable it … usual-

ly to defeat the minority's (which is, in fact, a majority) candidate." To the Court, this appears to be a classic case in which the plaintiffs' interests should be protected through the political process rather than through the jurisdiction of the federal courts.

11. Defendants have moved for summary judgment as to all claims. Thus the Title VI issue is appropriately before the Court.

nex noncontiguous properties. Thus, plaintiffs could possibly argue that the BGHA violated Title VI by refusing to ask for annexation, even if state law prohibited it.[12]

The Court will preemptively dispose of any such argument by noting that the federal courts should not be in the business of issuing futile relief. Even if the BGHA harbored racial reasons for declining to ask for annexation (after 1974), the Court cannot imagine what meaningful relief it could fashion to remedy the wrong. An Order to petition for annexation would not ameliorate the plaintiffs' condition in any way. Accordingly, the summary judgment must be entered as to the Title VI claims.

### CONCLUSION

The Court has considered the cross-motions for summary judgment, and the pertinent portions of the record, and being otherwise fully advised in the premises, it is

ORDERED AND ADJUDGED that

1. Plaintiffs' Motion for Summary Judgment [DE 139] be, and the same is hereby **DENIED**;

2. Defendants' Motion for Summary Judgment [DE 142] be, and the same is hereby **GRANTED**;

3. Final summary judgment shall be entered by separate Order.

---

12. Theoretically, plaintiffs could also argue that the Court's interpretation of Section 171 does not bar a claim that the BGHA violated the equal protection clause by refusing to petition for annexation. The same analysis that controls the Title VI issue would dispose of this contention as well.